## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STANLEY RUBENSTEIN, Derivatively on Behalf of Nominal Defendant JEFFERIES FINANCIAL GROUP INC.,<br><br>*Plaintiffs*,<br><br>*vs.*<br><br>LINDA L. ADAMANY, BARRY J. ALPERIN, ROBERT D. BEYER, FRANCISCO L. BORGES, W. PATRICK CAMPBELL, PAUL M. DOUGAN, BRIAN P. FRIEDMAN, MARYANNE GILMARTIN, RICHARD B. HANDLER, ALAN J. HIRSCHFIELD, JAMES E. JORDAN, ROBERT E. JOYAL, JACOB M. KATZ, JEFFREY C. KEIL, MICHAEL T. O'KANE, JESSE CLYDE NICHOLS, III, STUART H. REESE, MICHAEL SORKIN, JOSEPH S. STEINBERG,<br><br>*Defendants*,<br><br>JEFFERIES FINANCIAL GROUP INC.,<br><br>*Nominal Defendant*. | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>20 CV 2775<br>JUDGE CROTTY<br><br><u>DEMAND FOR JURY TRIAL</u> |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ....................................................................................................... 1

JURISDICTION AND VENUE ................................................................................. 3

PARTIES ..................................................................................................................... 4

DEFENDANTS' FIDUCIARY DUTIES ................................................................... 8

SUBSTANTIVE ALLEGATIONS ......................................................................... 12

I.     JEFFERIES'S CORPORATE AIRCRAFT ................................................... 12

II.    IN 2012, JEFFERIES'S BOARD AND COMPENSATON COMMITTEE
       APPROVED A BAREBONES ONE-PAGE JET USAGE POLICY .............. 12

III.   JEFFERIES'S SENIOR OFFICERS ENGAGED IN EXTENSIVE AND
       ABUSIVE PERSONAL USE OF JEFFERIES'S AIRCRAFT ...................... 13

       A.    Since At Least 2015, Jefferies's Senior Officers Have Commandeered
             Jefferies's Expensive Aircraft For Their Own Personal Use .............. 13

       B.    The Extensive Personal Use Of The Aircraft Has Cost Jefferies Millions
             Of Dollars In Disallowed Tax Deductions .......................................... 15

       C.    The Extensive Personal Use Extends As Far Back As 2012 ............... 17

IV.    JEFFERIES ALLOWED NON-EMPLOYEES TO USE JEFFERIES'S
       AIRCRAFT TO MAKE PERSONAL TRIPS, UNACCOMPANIED BY ANY
       JEFFERIES EMPLOYEE ............................................................................. 17

V.     JEFFERIES MISCLASSIFIED NUMEROUS PERSONAL FLIGHTS AS
       BUSINESS FLIGHTS .................................................................................. 19

VI.    JEFFERIES'S BOARD BREACHED ITS FIDUCIARY DUTIES BY ISSUING
       PROXY STATEMENTS THAT CONCEALED FROM SHAREHOLDERS THE
       ABUSIVE PERSONAL USE OF THE AIRCRAFT ..................................... 23

VII.   JEFFERIES'S BOARD AND AUDIT COMMITTEE BREACHED THEIR
       FIDUCIARY DUTIES BY FAILING TO OVERSEE COMPLIANCE AND
       STOP THE ABUSIVE PERSONAL USE OF JEFFERIES'S AIRCRAFT ... 28

       A.    Breaches Of Duty By The Audit Committee Defendants In Failing To
             Oversee Compliance ........................................................................... 28

       B.    Breaches Of Duty By Jefferies's Board And Its Special Committee In
             Overseeing Compliance And Failing To Stop Abusive Personal Use Of
             The Aircraft ......................................................................................... 30

VIII.   DERIVATIVE AND DEMAND ALLEGATIONS ............................................ 32

    A.   Plaintiff's Books And Records Demands And Jefferies's Response.................... 32

    B.   Plaintiff's March 6, 2018 Litigation Demand On Jefferies's Board.................... 34

    C.   The Special Committee's Findings Confirm Plaintiff's Claims Against The Company ........................................................................................................ 34

    D.   The Board Otherwise Rejected Plaintiff's Demand.............................................. 35

    E.   Plaintiff Demands Inspection Of Jefferies's Books and Records Relating To The Board's Demand Refusal ........................................................................ 36

    F.   The Demand Refusal Was Wrongful .................................................................. 36

CAUSES OF ACTION ...................................................................................................... 40

PRAYER FOR RELIEF .................................................................................................... 54

JURY DEMAND ................................................................................................................ 54

Plaintiff Stanley Rubenstein ("Plaintiff"), by his undersigned attorneys, brings this action to assert claims derivatively on behalf of Nominal Defendant Jefferies Financial Group Inc. ("Jefferies" or the "Company," and formerly known as Leucadia National Corporation ("Leucadia")) and Jefferies's shareholders.  Plaintiff bases his allegations on knowledge as to himself and his own acts, and upon information and belief as to all other matters based on the investigation of his attorneys, which included, but was not limited to, a review of documents produced by Jefferies in response to Plaintiff's demand to inspect Jefferies's books and records pursuant to New York common law and New York's Business Corporation Law ("BCL") § 624, U.S. Securities and Exchange Commission ("SEC") filings, news reports, press releases and other publicly available information regarding the Company.

## INTRODUCTION

1.      This case concerns the diversion and misappropriation of valuable Company assets by Jefferies's senior management, at a cost to shareholders that runs into the tens of millions of dollars and is still mounting.

2.      Since at least 2012, Jefferies's senior officers have been given virtually unrestricted access to Jefferies's corporate aircraft (the "Aircraft") to make personal trips all around the country and overseas that have absolutely no connection to the business of the Company.  As a result, Jefferies's senior officers have essentially appropriated the Company's Aircraft for their own personal purposes, making numerous personal trips on the planes to and from the officers' holiday homes and to go on vacation.  In some instances, Jefferies even permitted *non-employees* to commandeer the Company's Aircraft for personal travel that was unrelated to the business of the Company, and unaccompanied by any Company employee.

3.      Not only were these and other personal trips striking in their extravagance, they were striking in their excess.  Between 2015 and 2018, for example, personal use of the Aircraft was so excessive that it regularly constituted ***close to 70% of total use*** of the Aircraft, thereby displacing business use.

4.      None of this extravagant and excessive personal use of expensive corporate assets can be justified as a valid exercise of business judgment.  It is inconceivable how Jefferies could benefit by allowing its costly Aircraft to be used for personal purposes by a friend or a family member of an executive officer of Jefferies, at the Company's expense.  Indeed, as Jefferies's senior officers were aware, their excessive and abusive personal use directly violated the Company's internal policies and code of business practice.  Those policies and code of business practice expressly require that all officers and directors protect the Company's assets and ensure their efficient use.

5.      The abusive personal use by Jefferies's senior officers has come at enormous cost to the Company.  The fixed costs directly allocable to personal use are not only significant, they are also measurable.  Indeed, all companies are required under the federal tax code to track the amount of a corporate aircraft's fixed costs attributable to personal use, because the tax code provides that this amount may not be deducted as a business expense.  The fixed costs of maintaining an aircraft fleet are enormous, and include the costs of maintaining an aviation department staff, flight crew salaries and benefits, aircraft maintenance, hangar rent, interest expenses, depreciation expenses and many other expenses.  Thus, because Jefferies was already internally tracking the fixed costs allocable to the personal use, Jefferies should have charged these costs to its senior officers.  Because personal use consistently constituted close to 70% of total use,

these fixed costs (which were also disallowed as tax deductions) have amounted to tens of millions of dollars since just 2015.  This cost continues to mount to this day.

6.      All this egregious behavior was possible only because Jefferies's board of directors ("Board") breached their duties to oversee Jefferies's management.  In breach of their fiduciary duties, Jefferies's Board approved a barebones, one-page Corporate Jet Usage Policy ("Jet Usage Policy") that contained no restrictions on personal travel by the senior officers.  The Board failed to conduct a proper investigation and failed to make any changes to the Jet Usage Policy even after Plaintiff and his counsel presented the Board with the results of their investigation, including information indicating that close to 70% of the use of the Aircraft was personal travel by the senior officers and their family members and friends; that the senior officers had allowed the Aircraft to be commandeered by their family members and friends for personal travel without any employee on board; and that this personal travel cost the Company tens of millions of dollars in expenses.  Even worse, year after year, Jefferies's Board concealed the true costs of the officers' lavish personal use by issuing false and misleading proxy statements that failed to disclose all the true costs of the personal use.

7.      In this manner, Jefferies's senior officers and its Board have abused the trust placed in them by Jefferies's shareholders, and breached their fiduciary duties to the Company and its shareholders.  Despite Plaintiff's demand that the Board take steps to address the misconduct, the Board has taken only partial steps, and refuses to undertake further significant and substantive steps necessary to correct the misconduct by the Company's senior officers.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C.

§ 78aa, because the claims in this action arise under, among other laws, Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9.

9.      This Court also has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship among the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.  As alleged further below, Plaintiff is a citizen of the State of Alabama while Defendants are citizens of other states.

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391(b), (c) and (d).  Many of the acts and transactions that constitute violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.

## PARTIES

11.     Plaintiff Stanley Rubenstein is a citizen of the State of Alabama.  Plaintiff has continuously held shares of Jefferies common stock since March 8, 2017.

12.     Nominal Defendant Jefferies (formerly known as Leucadia) is a corporation existing under the laws of New York with its principal place of business located at 520 Madison Avenue, New York, New York 10022.  Jefferies is a diversified holding company which owns a diverse range of businesses, including businesses operating in financial services.  Jefferies conducts business throughout the State of New York and elsewhere and does a significant amount of business in New York City.

13.     Defendant Linda L. Adamany ("Adamany") has served as a director of Jefferies since 2014.  Adamany has been a member of the Audit Committee and the Nominating and Corporate Governance Committee (the "Governance Committee") since 2014.  Adamany has also

been a member of the Valuation Oversight Committee since approximately 2018, and served as the Chairperson of the Risk and Liquidity Oversight Committee since approximately 2018. Adamany is a citizen of the States of Florida and Ohio.

14.      Defendant Barry J. Alperin ("Alperin") has served as a director of Jefferies since 2018.  Since 2018, Alperin has been a member of the Audit Committee, the Compensation Committee, the Governance Committee, and the Valuation Oversight Committee.  Alperin is a citizen of the State of New York.

15.      Defendant Robert D. Beyer ("Beyer") has served as a director of Jefferies since 2013.  Beyer has been the Chairperson of the Compensation Committee since approximately 2014. Beyer has been a member of the Risk and Liquidity Oversight Committee since approximately 2018.  Beyer is a citizen of the State of California.

16.      Defendant Francisco L. Borges ("Borges") has served as a director of Jefferies since 2013.  Borges has been a member of the Audit Committee and the Governance Committee since approximately 2014.  Borges is a citizen of the States of Massachusetts and Florida.

17.      Defendant W. Patrick Campbell ("Campbell") served as a director of Jefferies from 2013 until 2018.  Campbell served as the Chairperson of the Audit Committee from approximately 2013 to 2018.  Campbell is a citizen of the State of New York.

18.      Defendant Paul M. Dougan ("Dougan") served as a director of Jefferies (then known as Leucadia) from 1985 to approximately 2013.  In 2012, Dougan was a member of the Audit Committee, Compensation Committee, and Governance Committee.  Dougan is a citizen of the State of Utah.

19.      Defendant Brian P. Friedman ("Friedman") has served as Jefferies's President and as a director since March 1, 2013.  Friedman is a citizen of the State of New York.

20.     Defendant MaryAnne Gilmartin ("Gilmartin") has served as a director of Jefferies since 2018.  Gilmartin has been a member of the Governance Committee and the Risk and Liquidity Oversight Committee since approximately 2018.  Gilmartin is a citizen of the State of New York.

21.     Defendant Richard B. Handler ("Handler") has served as Jefferies's Chief Executive Officer and as a director since March 2013.  Handler is a citizen of the State of New York.

22.     Defendant Alan J. Hirschfield ("Hirschfield") served as a director of Jefferies (then known as Leucadia) from 2004 to approximately 2013.  In 2012, Hirschfeld was a member of the Audit Committee and Governance Committee.  Hirschfield is a citizen of the State of Wyoming.

23.     Defendant James E. Jordan ("Jordan") served as a director of Jefferies (then known as Leucadia) from 1981 to approximately 2013.  In 2012, Jordan was a member of the Audit Committee, Executive Committee, Compensation Committee and Governance Committee.  Jordan is a citizen of the States of Florida and Tennessee.

24.     Defendant Robert E. Joyal ("Joyal") has served as a director of Jefferies since 2013.  Joyal has been a member of the Compensation Committee since approximately 2013, and the Chair of the Governance Committee since approximately 2013.  Joyal is a citizen of the State of New Hampshire.

25.     Defendant Jacob M. Katz ("Katz") has served as a director of Jefferies since 2018.  Katz has served as the Chairperson of the Audit Committee since 2018, and a member of the Risk and Liquidity Oversight Committee and the Valuation Oversight Committee since approximately 2018.  Katz is a citizen of the State of New York.

26.     Defendant Jeffrey C. Keil ("Keil") served as a director of Jefferies from April 2004

6

(then known as Leucadia) to 2018.  Keil served on the Audit Committee from 2004 to approximately 2018, including as Chair of the Audit Committee from 2004 to approximately 2013, and the Governance Committee from approximately 2012 to approximately 2018.  Keil also served on the Executive Committee from 2009 to approximately 2012.  Keil is a citizen of the State of New York.

27.    Defendant Michael T. O'Kane ("O'Kane") has served as a director of Jefferies since March 1, 2013.  O'Kane has served as the Lead Independent Director since approximately 2017.  O'Kane has been a member of the Audit Committee, Compensation Committee, and Governance Committee since approximately 2013, and the Chair of the Valuation Oversight Committee since approximately 2018.  O'Kane is a citizen of the States of Connecticut and Florida.

28.    Defendant Jesse Clyde Nichols, III ("Nichols") served as a director of Jefferies (then known as Leucadia) from 1978 to approximately 2013.  In 2012, Nichols was a member of the Audit Committee, Compensation Committee, and Governance Committee.  Nichols is a citizen of the State of Kansas.

29.    Defendant Stuart H. Reese ("Reese") has served as a director of Jefferies since 2013.  Reese has been a member of the Audit Committee since approximately 2014, and the Risk and Liquidity Oversight Committee since approximately 2018.  Reese is a citizen of the States of Florida and Maine.

30.    Defendant Michael Sorkin ("Sorkin") served as a director of Jefferies (then known as Leucadia) in 2012.  Sorkin is a citizen of the States of New Jersey, New York and Pennsylvania.

31.    Defendant Joseph S. Steinberg ("Steinberg") has served as Jefferies's Chairman of the Board from March 2013 to the present.  Prior to that, Steinberg served as President of Jefferies (then known as Leucadia) from January 1979 until March 1, 2013, and as a director since

December 1978.  Steinberg is a citizen of the State of New York.  Despite being the Chairman of the Board, Steinberg still performs executive functions and is paid an annual base salary.  Steinberg is also identified as one of the Company's "named executive officers."

32.     Defendants Steinberg, Handler and Friedman are hereinafter collectively referred to as the "Officer Defendants."

33.     Defendants Adamany, Alperin, Beyer, Borges, Campbell, Dougan, Friedman, Gilmartin, Handler, Hirschfield, Jordan, Joyal, Katz, Keil, O'Kane, Nichols, Reese, Sorkin and Steinberg are hereinafter collectively referred to as the "Director Defendants."

34.     Defendants Adamany, Alperin, Borges, Campbell, Dougan, Hirschfield, Jordan, Katz, Keil, O'Kane, Nichols and Reese are hereinafter collectively referred to as the "Audit Committee Defendants."

## DEFENDANTS' FIDUCIARY DUTIES

35.     As officers and directors of Jefferies, a New York corporation, Defendants owe Jefferies and its shareholders the highest fiduciary duties of loyalty, good faith and care in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.

36.     Under the duty of loyalty, directors and officers are required, when conducting the affairs of the corporation, to act solely in furtherance of the best interests of the corporation and its shareholders and to act in good faith.  Directors and officers are prohibited from engaging in self-dealing.

37.     Under the duty of care, directors and officers are required to discharge their duties to the corporation with the same diligence and care which ordinary persons would exercise under similar circumstances.  Under this duty, directors are required to exercise care in overseeing the

8

business and operations of the corporation and the conduct of corporate employees, including the use of corporate assets. They are responsible for ensuring that appropriate information and reporting systems are established and implemented so that senior management and the board have adequate information concerning the company's business and operations, material events, and compliance with applicable statutes and regulations. Moreover, the directors have a duty to review this information.

38.     Jefferies's directors who serve as members of committees of the Board have additional responsibilities. According to Jefferies's Audit Committee Charter, the purpose of the Audit Committee is, among other things, to assist the Board in its responsibility to oversee management regarding "the conduct of the Company's financial reporting process, including by overviewing the integrity of the financial reports and other financial information provided by the Company to any governmental or regulatory body," "the Company's legal and regulatory compliance," and "the Company's code of ethics as established by management and the Board." Among other responsibilities, the Audit Committee is required to report regularly to the Board on its findings and recommendations, including "on any issues that arise with respect to the quality or integrity of the Company's financial statements" or "the Company's compliance with legal or regulatory requirements."

39.     According to Jefferies's Compensation Committee Charter, the purpose of the Compensation Committee is, among other things, "to advise senior management on the administration of the Company's compensation programs, review and approve the compensation [of] the Executive Officers of the Company" and "prepare any report on executive compensation required by the rules and regulations of the Securities and Exchange Commission." Among other responsibilities, the Compensation Committee is to "[a]ssist with regulatory compliance with

respect to compensation matters, including overseeing the Company's policies on structuring compensation programs to preserve tax deductibility, and, as and when required, establishing performance goals and certifying that performance goals have been attained."  Additionally, the Compensation Committee is required to "[p]repare a report to be included in the Company's annual proxy statement, in accordance with applicable rules and regulation of the NYSE, SEC and other applicable regulatory bodies."

40.    Under the Governance Committee's Charter, the purpose of the Governance Committee is to, among other things, assist the Board by "developing and recommending to the Board a set of corporate governance principles."  Among other responsibilities, the Governance Committee is to "make recommendations to the Board with respect to matters affecting corporate social, environmental and governance (ESG) responsibilities and related corporate conduct consistent with the Company's Corporate Social Responsibility Principles."  Additionally, the Governance Committee is to "[e]stablish and recommend to the Board, oversee the implementation and effectiveness of and recommend modifications as appropriate to, the Company's Corporate Governance Guidelines."

41.    Jefferies's officers and directors are also bound by various Company policies.

42.    Jefferies has a Code of Business Practice that, by its terms, "applies to Jefferies Financial Group Inc. and all of its subsidiaries (collectively, the "Company"), and the Company's employees, officers and directors."  Jefferies requires that "[e]ach employee and officer [ ] be required to annually certify in writing his or her receipt and review of this [Code of Business Practice]."  Under the Code of Business Practice, "[a]ny alleged violations of this Code by an employee, officer or director will be reviewed by the Compliance Officer, or, in appropriate

circumstances, by the Board of Directors (or a designated committee thereof), which will determine the appropriate action to take."

43.    Jefferies's Code of Business Practice sets forth certain Company principles, including "Protection and Proper Use of Company Assets."  Under this principle:

> ***All employees, officers and directors should protect the Company's assets and ensure their efficient use.  Theft, carelessness and waste have a direct impact on the Company's profitability***.  All Company assets should be used in accordance with Company policy, which may include the incidental or otherwise approved use for personal purposes.

(emphasis added).  Jefferies's Code of Business Practice additionally states that, "[w]henever there is doubt about the right choice to make, then the individual should seek guidance and ask questions about the right thing to do, and to keep asking until it is obtained."

44.    Under the Company's Corporate Social Responsibility Principles, Jefferies has adopted, among other principles, "Act with Integrity," which requires Jefferies to "[c]onduct business in accordance with all applicable laws, rules and regulations."

45.    Pursuant to the Company's Corporate Governance Guidelines, "[i]t is the responsibility of the Board of Directors to supervise and direct the management of the Company in the interest and for the benefit of the Company's shareholders and in such a manner as the Board determines appropriate."  Additionally, under the Corporate Governance Guidelines, the "Board conducts an annual self-evaluation of its performance and the performance of the Audit, Compensation and Nominating and Corporate Governance committees and the performance of each individual director. The evaluations are based on criteria developed by the Board."

46.    As set forth below, based on the above duties, Defendants breached their fiduciary duties of care and loyalty as directors and officers of Jefferies.

## SUBSTANTIVE ALLEGATIONS

### I.      JEFFERIES'S CORPORATE AIRCRAFT

47.     At all relevant times, Jefferies has owned a fleet of three aircraft, flying under the tail numbers N91LA, N92LA and N93LA (the Aircraft).  Aircraft N91LA and N92LA are both Gulfstream GV-SPs with a twenty-seat capacity.  Aircraft N93LA is a Bombardier Challenger with an eight-seat capacity.

### II.     IN 2012, JEFFERIES'S BOARD AND COMPENSATON COMMITTEE APPROVED A BAREBONES ONE-PAGE JET USAGE POLICY

48.     In 2011, another shareholder, Central Laborers' Pension Fund ("Central Laborers"), conducted an investigation into Leucadia (as Jefferies was then known) and made a demand for the Company's books and records.  Despite being presented with the opportunity, the Board failed to conduct a proper investigation, and failed to implement a comprehensive aircraft policy or other corrective measures.

49.     Instead, the Compensation Committee (consisting of Defendants Nichols (Chair), Dougan and Jordan) considered and then approved a barebones, one-page policy in order to bury the investigation by Central Laborers.  As a result, the policy was grossly deficient.

50.     For example, the policy did not contain a basic statement that the Aircraft fleet was to be used primarily for business purposes.  The policy did not contain any restrictions on the ability of the Officer Defendants to allow non-employee family members and friends to use the Aircraft to make personal trips, unaccompanied by a Company employee, and at the Company's expense.  This conscious disregard of duty set the conditions for the subsequent abuses of the Aircraft by the Officer Defendants.

51.     On December 3, 2012, Leucadia held a joint meeting of the Board (consisting of Defendants Cumming, Dougan, Hirschfield, Jordan, Keil, Nichols, Sorkin and Steinberg) and the

Compensation Committee.  At the meeting, the Compensation Committee recommended "that the Board approve and adopt the airplane usage policy and that the Chairman of the Audit Committee be responsible for overseeing compliance with the policy."  As a result, the Board approved the barebones, one-page Jet Usage Policy.  Jefferies's one-page policy is applicable to "all Company-owned or controlled aircraft and to all Leucadia employees, directors and officers."  In the Jet Usage Policy, the Company states that it is "committed to compliance with all applicable legal, Internal Revenue Service ('IRS') and Securities and Exchange Commission ('SEC') standards."

**III.   JEFFERIES'S SENIOR OFFICERS ENGAGED IN EXTENSIVE AND ABUSIVE PERSONAL USE OF JEFFERIES'S AIRCRAFT**

> **A.   Since At Least 2015, Jefferies's Senior Officers Have Commandeered Jefferies's Expensive Aircraft For Their Own Personal Use**

52.     Since at least 2015, Jefferies and its Board have permitted the Company's senior executive officers to make extensive personal use of the Aircraft that far exceeded what could reasonably be justified under the Company's Jet Usage Policy and Code of Business Practice.  As described in greater detail below, these flights were made to and from destinations all around the country and overseas, frequently with large entourages of family members and friends with no connection to the Company, and took up large portions of the flying hours of the Company's Aircraft.  In fact, so extensive was this personal use that it regularly *averaged close to 70%* of the Aircraft's total use.  These personal flights cumulatively cost Jefferies and its shareholders millions of dollars, for which the senior officers did not reimburse the Company.

53.     Jefferies maintains internal Company operational flight logs organized by month for each of the Aircraft (the "Aviation Reports").  The Aviation Reports show the date, origin, destination, departure and arrival time, number of passengers, the identity of the passengers and flight hours for each flight leg flown by each Aircraft.  The Aviation Reports indicate whether a

flight was for a business or personal purpose, and if for business, sometimes contain a business explanation or notation.

54.    Based on the Aviation Reports provided by Jefferies for the years 2015 through November 2018,[1] Jefferies's senior executive officers – Steinberg, Handler and Friedman – have used Jefferies's Aircraft as their own personal toys and to shuttle themselves and their families and friends to numerous vacation destinations around the country and overseas.

55.    Based on the "occupied seat hours" methodology used internally by Jefferies (described more fully in paragraph 60 below), the percentages of personal use relative to total use of the Aircraft for the years 2015 to 2018 were:

| Personal Use As Percentage Of Total Use (Occupied Seat Hours) | | | | |
|---|---|---|---|---|
| Year | N91LA | N92LA | N93LA | All Planes |
| 2015 | 54.77% | 77.05% | 58.83% | 65.32% |
| 2016 | 74.99% | 76.05% | 65.77% | 73.97% |
| 2017 | 60.34% | 75.02% | 60.53% | 67.52% |
| 2018[1] | 57.04% | 66.04% | 68.33% | 63.04% |

(1) For the eleven months through November 30, 2018.

56.    In short, under the Board's watch, the Aircraft have not really been used for business purposes at all.  Instead, Jefferies has allowed its three most senior officers (the Officer Defendants) unfettered access to the Company's Aircraft for personal use, resulting in personal use that *averaged close to 70%* between 2015 and 2018 alone.  As described more fully below, the

---

[1]    In 2018, Jefferies changed its fiscal year end to November 30, 2018, to align Jefferies with its largest operating subsidiary.

operating costs of Jefferies's Aircraft fleet totals approximately $8.3 million a year.  As such, the Company incurs an average of $5.6 million in costs every year to satisfy the Officer Defendants' lavish personal travel – a startling example of corporate waste.

57.     Reflecting the extent to which the Company's Aircraft has come to be commandeered by the Officer Defendants for personal use, a review of the Company's books and records reflects that Jefferies has no business need for three aircraft.  Based on the Company's flight logs for the period from January 2015 through December 2017, there were only 14 situations during the entire three-year period when a third plane was needed for business purposes.  These 14 instances represented a total of 51.2 hours of flight time from January 2015 through December 2017, or approximately 17 hours of business flight time per year.  This business travel could easily have been satisfied by commercial carriers.  For all other times, two planes were sufficient and available to satisfy all of the Company's business needs.

**B.      The Extensive Personal Use Of The Aircraft Has Cost Jefferies Millions Of Dollars In Disallowed Tax Deductions**

58.     The out-of-pocket costs expended by Jefferies to facilitate the Officer Defendants' personal travel are particularly harmful to Jefferies because, under the federal tax code, these expenses are not tax deductible.

59.     Under 26 U.S.C. § 274(a) and (e), Jefferies may not deduct any operating costs of the Aircraft attributable to personal use by officers and directors.  These costs are significant, and include *fixed* costs such as aircraft depreciation, pilot and crew salaries, hangar fees, insurance, maintenance costs and management fees, as well as variable costs such as the cost of fuel.

60.     To determine the costs attributable to personal use, a company is required to allocate the expenses of its corporate jet fleet between personal travel and business travel for each taxable year.  A company uses either the "occupied seat hours" or "occupied seat miles" method

to determine the total amount of personal use, on the one hand, and the total amount of business use, on the other.  "Occupied seat miles"/"occupied seat hours" are calculated by multiplying the total flight miles or flight hours of a particular flight leg against the number of passengers on the flight.  Thus, if a flight was of 3.0 hours duration and the distance flown was 2,000 miles, and there were four passengers on the flight, the "occupied seat hours" would be 12.0 (3.0 x 4) and the "occupied seat miles" would be 8,000 (2,000 x 4).  In calculating occupied seat hours/occupied seat miles, personal passengers include a spouse or family member of the officer or director, or another person with a relationship to the specified individual.  Thus, if the occupied seat hours/miles for personal travel in a given year constitutes 50% of the total occupied seat hours/miles for all travel on a company's corporate jet fleet, 50% of the operating expenses (fixed and variable costs) associated with the company's jet fleet will be non-deductible.

61.     In this case, Jefferies elected to use the occupied seat hours methodology.  Based on the occupied seat hours methodology, the percentage of personal use relative to total use, and, therefore, the percentage of Jefferies's Aircraft expenses disallowed under Section 274(e), were as follows from 2015 through 2019:

| Disallowed Tax Deduction Impact Of Personal Travel | | |
|---|---|---|
| Year | % Personal Use (All Planes) | Disallowed Tax Deduction Impact[1] |
| 2015 | 65.32% | $5,400,801 |
| 2016 | 73.97% | $6,116,696 |
| 2017 | 67.52% | $5,583,004 |
| 2018[2] | 63.04% | $4,769,596 |
| 2019[3] | _ | $4,900,000 |

(1) Disallowed tax deduction impact for years 2015, 2016 and 2017 is calculated by multiplying the percentage of personal occupied seat hours against the estimated annual Aircraft operating expenses in each year. Based on books and records produced by Jefferies, the average annual Aircraft operating expenses are estimated to be $8,268,697.

(2) For the 11 months through November 30, 2018, the Aircraft operating expenses were $7,566,424, according to books and records produced by Jefferies.

(3) Jefferies did not produce any books and records for 2019. The disallowed tax deduction is derived from Jefferies's proxy statement, filed on March 3, 2020, at 55, n.3.

62.     Virtually all of the above disallowed tax deductions are directly attributable to the personal travel by the Officer Defendants Steinberg, Handler and Friedman. As set forth in the table above, based on an estimated annualized operating cost of approximately $8,268,697, the Officer Defendants' high percentage of personal use cost Jefferies a total of **$26,770,097** in disallowed tax deductions from 2015 through November 2019. Despite this direct financial impact to the Company caused by the Officer Defendants, Jefferies has never attempted to obtain reimbursement from the Officer Defendants, or even to disclose these amounts as part of the Officer Defendants' compensation, as described in Section VI below.

### C.     The Extensive Personal Use Extends As Far Back As 2012

63.     Upon information and belief, and based on Federal Aviation Administration records obtained by Plaintiff and his counsel, the senior officers of Jefferies have been engaged in extensive and abusive personal use of the Aircraft since as early as 2012, when Jefferies was then known as Leucadia.

64.     As a result, Jefferies has incurred millions of dollars of additional, non-deductible costs not reflected in the table above. In addition, other senior officers apart from the Officer Defendants are potentially liable.

## IV.     JEFFERIES ALLOWED NON-EMPLOYEES TO USE JEFFERIES'S AIRCRAFT TO MAKE PERSONAL TRIPS, UNACCOMPANIED BY ANY JEFFERIES EMPLOYEE

65.     In violation of its own internal company policies, Jefferies also permitted non-employees to use the Company's Aircraft for personal travel that was unrelated to the business of the Company, and unaccompanied by any Company employee. In other words, the non-employees

(usually family members and friends of the Officer Defendants) were not just taking piggyback rides on existing flights already booked by Company employees.  Instead, these family members and friends of the Officer Defendants were permitted to *commandeer* the Company's Aircraft to make personal flights *at the Company's expense*.

66.     Between 2015 to 2017 alone, there were **34** instances of unaccompanied, non-employee flights – a brazen misuse of expensive corporate assets that happened under the Board's watch.  These unaccompanied, non-employee flights cost the Company approximately $635,000, which expenses were additionally non-deductible.   In some extreme examples, the Officer Defendants commandeered multiple planes at the same time for their family members and friends to fly, unaccompanied, at the Company's expense.

67.     For example, on November 12, 2017, Aircraft N91LA flew 11 personal guests from Wilmington, North Carolina to Windsor Locks, Connecticut, unaccompanied by any Company employee.  On the same day, at almost the same time, N92LA flew 14 personal guests from Wilmington to Tucson, and then flew 13 personal guests from Tucson to San Diego.  On both legs of this trip, there was no Company employee on board.  All of these flights were authorized by Defendant Steinberg.

68.     As another example, on November 8, 2015, Aircraft N92LA flew four personal guests from Morristown, New Jersey to Tampa, Florida, unaccompanied by any Company employee.  On the same day, N93LA flew four personal guests back from Tampa to New Orleans (presumably to drop off Handler's daughter and friends at Tulane University), unaccompanied by any Company employee, then made a deadhead flight (*i.e.*, no passengers) from New Orleans to Morristown.  According to the notes in Jefferies's flight logs, these flights were for the Giants vs. Tampa Bay NFL game.

69.     There is no basis under any conception of the business judgment rule to allow non-employee family members and friends of the Officer Defendants to use the Aircraft for personal purposes, unaccompanied by any employee.   Such use of expensive corporate assets at the Company's expense amounts to a stunning instance of corporate waste.

70.     In addition, this personal use violated Jefferies's own policies.   For example, Section 2 of Jefferies's Code of Business Practice ("Conflicts of Interest") states: "A 'conflict of interest' occurs when an individual's private interests interferes – or even appears to interfere – in any way with the interests of the Company as a whole. A conflict of interest can arise when an employee, officer or director takes actions or has interests that may make it difficult to perform his or her Company work objectively and effectively. ***Conflicts of interest also arise when an employee, officer or director, or member of his or her family, receives improper personal benefits as a result of his or her position in the Company***." (emphasis added).   Section 12 ("Protection and Proper Use of Company Assets") states unequivocally: "***All employees, officers and directors should protect the Company's assets and ensure their efficient use***. ***Theft, carelessness and waste have a direct impact on the Company's profitability.*** All Company assets should be used in accordance with Company policy, which may include the incidental or otherwise approved use for personal purposes. Any suspected incident of fraud, theft, loss or waste should be immediately reported for investigation." (emphasis added).

## V.   JEFFERIES MISCLASSIFIED NUMEROUS PERSONAL FLIGHTS AS BUSINESS FLIGHTS

71.     Based on Jefferies's books and records, Jefferies appears to have misclassified numerous personal flights as "business" flights, thereby understating the extent of the financial damage suffered by Jefferies due to the Officer Defendants' personal travel.

19

72.     For example on May 5, 2016, N91LA made a deadhead flight from Los Angeles to Cancun, Mexico to pick up Handler and two personal guests.  On Saturday, May 7, 2016, Handler and his two personal guests flew from Cancun to Westchester, New York, and Handler posted on social media a photo of himself on the corporate jet holding four puppies with the caption, "Rescue Dogs, the only way to travel! #lostdogfoundation."  Handler's friend Tilman Fertitta commented: "It's good to see a G 5 [Gulfstream V] going to great use."  The aircraft then made a deadhead repositioning flight to Morristown, New Jersey.  Jefferies classified all three legs of this trip as business.

73.     In another instance, on Friday, June 17, 2016, Handler flew on Aircraft N92LA with eight personal guests from Westchester, New York to Rome, Italy.  On June 18, 2016, after arriving, Handler posted a photo of himself on Instagram toasting with his family with the caption, "When in Rome! #family #brunch #love."  On June 19, 2016, Handler posted a photo of himself with his family on Segways in Rome, with the caption, "Great brunch w a wonderful 'Segway' to the best #rome #fathersday tour. #paulblartmallcop."  On June 22, 2016, Handler yet again posted a photo of himself and his wife on a boat in Capri, Italy.  On Saturday, June 25, 2016, Aircraft N92LA made a deadhead flight to Catania, Sicily.  On Sunday, June 26, 2016, Handler returned on the aircraft with seven personal passengers and two business passengers from Catania, Sicily to Naples, and then continued to London where the two business passengers and four of the personal passengers disembarked.  The aircraft then continued with Handler and four personal guests from London to Morristown, New Jersey.  Jefferies classified the entire trip as business.

74.     Similarly, on Thursday, October 27, 2016, Handler flew on Aircraft N91LA from Morristown to Honolulu and then to Sydney, Australia with three personal guests.  Jefferies classified both legs as business.  The following day, on October 28, 2016, Handler posted on his

personal Instagram account that he was "#downunder to retrieve @skyhandler (hopefully) #daughters #gooddaymate."  Skylar Handler is Handler's daughter.  The next day, on October 29, 2016, Handler posted on his personal Instagram account a photo of himself doing shots at a Sydney nightclub with his wife, daughter and eight friends.  During the trip, Handler also made a ten-day excursion to New Zealand with personal guests, which leg was classified as personal.  Finally, on Saturday, November 12, 2016, Handler flew with seven personal passengers on N91LA from Frankton, New Zealand to Honolulu and then on to Morristown, New Jersey.  Again, Jefferies classified this return trip as business.  On that same day, Handler posted on Instagram, "#Toasting the end of a wonderful #vacation w #champagne and my #girls on top of the #world," with a photo of himself drinking champagne with his wife and daughter on a mountaintop in front of a helicopter.

75.   On Thursday, May 25, 2017, over the Memorial Day weekend, Handler flew on Aircraft N92LA with four personal guests from Morristown, New Jersey to Genoa, Italy on a flight classified as business.  Upon arriving in Genoa, Handler disembarked, and his daughter Skylar continued on the aircraft with two personal guests to Florence on a flight designated as personal.  The aircraft then made a deadhead return flight to Rome.  On May 27, 2017, Handler posted on his Instagram account a photo of himself and his wife with four other couples in Portofino, with the caption "#portofino #fun! #5hotties! #5luckyguys #ineedmeabank…#funprince.."  A viewer commented on the photo: "Nice group…and making it big HB for Marigay!"  On May 28, 2017, Handler posted a photo of his wife with the location, "Il Pellicano luxury hotel Porto Ercole" and with the caption, "@marthahandler glowing in the #italianriviera!"  On Monday, May 29, 2017, the aircraft made a deadhead flight from Rome to Naples to pick up Handler and five personal guests and two business guests.  The aircraft then made a series of flights to pick up and drop off

several personal passengers and one business passenger.  First, the aircraft flew Handler and his party to Florence to pick up three more personal guests (presumably Skylar and her friends).  Next, the aircraft flew to London to drop off three personal guests and one business guest.  Then, the aircraft flew to Hawarden, UK to drop off one personal guest and one business guest.  Finally, the aircraft returned to Morristown, New Jersey with Handler and four personal guests.  Jefferies classified all of these legs, from Naples to Morristown, as business.

76.     Jefferies's misclassification of personal flights as business flights also exposes Jefferies to potential claims from regulators.  Under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), an issuer may not solicit any proxy in respect of any security in contravention of such rules and regulations as the SEC may prescribe.  Rule 14a-9 prohibits the use of proxy statements containing materially false or misleading statements or materially misleading omissions. Rule 14a-3 prohibits issuers from soliciting proxies without furnishing proxy statements containing the information specified in Schedule 14A, which includes executive compensation disclosures pursuant to Item 402 of Regulation S-K.  Similarly, Section 13(a) of the Exchange Act and Rules 13a-1 and 12b-20 require every issuer to file with the SEC information, documents, and annual reports as the Commission may require, and mandate that the periodic reports contain such further material information as may be necessary to make the required statements not misleading.

77.     In 2018, the SEC made findings and issued a cease and desist order against The Dow Chemical Company ("Dow") in connection with Dow's failure to adequately disclose executive perquisites, including the personal use of Dow aircraft.  The SEC found that Dow "had inadequate processes and procedures to ensure proper reporting of perquisites" and that Dow had, "[a]s a result of applying an improper standard for perquisite disclosure from 2011 through 2015

for its named executive officers … understated its disclosed perquisites in its 2013 to 2016 proxy statements." (emphasis added).  Accordingly, the Commission charged Dow with violations of Section 14(a) of the Exchange Act and Rule 14a-9, and Section 13(a) of the Exchange Act and Rules 13a-1 and 12b-20.  Dow settled with the SEC by retaining an independent consultant for a period of one year and paying a civil penalty of $1.75 million.

78.    Additionally, Jefferies's misconduct alleged here provides an independent basis for claims for violations of the SEC's "Books and Records" requirements.  Section 13(b)(2)(A) of the Exchange Act mandates that an issuer must "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer."  The SEC has brought enforcement actions against issuers for their failure to maintain proper books and records in connection with executive perquisites.  *See*, *e.g.*, *In the Matter of Sito Mobile, Ltd.* (SEC Release No. 86573 (August 5, 2019)).

## VI.    JEFFERIES'S BOARD BREACHED ITS FIDUCIARY DUTIES BY ISSUING PROXY STATEMENTS THAT CONCEALED FROM SHAREHOLDERS THE ABUSIVE PERSONAL USE OF THE AIRCRAFT

79.    Defendants have been able to indulge in their extravagant lifestyles without attracting any public scrutiny only because, in the Company's proxy statements, Defendants have repeatedly concealed from shareholders the true costs of the personal use, in at least two ways.

80.    First, despite the fact that personal use accounted for close to 70% (*i.e.*, the majority) of total use of the Aircraft, Defendants never attributed a portion of the fixed costs of operating the Aircraft to the Officer Defendants.

81.    Under the SEC's Adopting Release No. 33-8732A (the "Adopting Release") effective November 7, 2006, the SEC requires companies to include the "aggregate incremental

cost" of any perquisites awarded to the Company's "named executive officers"[2] when disclosing

the amount of those officers' compensation.  Perquisites include personal travel made on corporate

jets by the named executive officers.

82.     The Adopting Release ushered in a major change in the way companies are required

to disclose perquisites and other forms of executive compensation.  As the SEC explained in the

Adopting Release, "we are adopting changes to the disclosure of perquisites and other personal

benefits to improve disclosure and facilitate computing a total amount of compensation."  Under

the rules introduced by the Adopting Release, the SEC requires that any perquisite, such as

personal aircraft use, be separately identified if it exceeds $10,000 in value.  In addition, if the

value of the specific perquisite exceeds the greater of $25,000 or 10% of total perquisites, a

company must disclose the value of that perquisite.

83.     The SEC does not define how "aggregate incremental costs" of a particular

perquisite should be calculated.  However, the SEC has exhorted companies to follow a

"principles"-based approach to calculating aggregate incremental costs of any perquisite.  *See*

*Principles Matter*, September 6, 2006 speech, John W. White (Director of the SEC's Division of

Corporation Finance) ("Aside from aggregate incremental cost, there is no firm rule in the

Commission Release, or from the staff, on valuing corporate aircraft usage, let alone deadhead

flight legs. There are, however, principles, and companies should not play games with these

questions or their answers to them and the disclosures that go with them.").  Such a principles-

based approach would also be consistent with Jefferies's own Code of Business Practice (January

10, 2019) ("We do not permit intentional inaccuracies in reporting, falsehoods or misclassification

---

[2]     A company's "named executive officers" are the Chief Executive Officer, the Chief
Financial Officer, and the three most highly compensated executive officers other than the CEO
and the CFO.

of transactions as to accounts, departments or accounting periods, all transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period and all applicable records must fairly and accurately reflect in reasonable detail the Company's assets, liabilities, revenues and expenses.")

84.     Consistent with the greater transparency intended by the Adopting Release, and the above principles-based approach, Jefferies should have allocated a portion of the fixed costs of the Aircraft fleet to the Officer Defendants when disclosing the "aggregate incremental cost" of those individuals' personal travel on the Company's Aircraft.  It is reasonable to allocate a portion of aircraft fixed costs when the amount of personal use of corporate aircraft reaches a significant percentage of total aircraft use.  *See*, *e.g.*, Mark Maremont and Daniel Gilbert, *Chesapeake's Private Jets in Cross Hairs*, THE WALL STREET JOURNAL (May 8, 2012) ("Brinkley Dickerson, an attorney at Troutman Sanders LLP in Atlanta who advises companies on aircraft-disclosure rules, said companies should probably include fixed costs in their aircraft disclosures when personal usage exceeds 20% to 30% of the overall flying time. 'To do otherwise would be misleading,' he said.") (emphasis added).  In the case of Jefferies, personal use as a proportion of total use of the Aircraft **averaged close to 70%** between 2015 and 2018.

85.     Furthermore, the fixed costs attributable to personal use are readily ascertainable and can be *directly* traced to each Officer Defendant.  As described above, Jefferies tracks the amount of the Aircraft operating costs (which includes fixed costs and variable costs) that are attributable to personal travel using the "occupied seat hours" methodology.  These operating costs are then disallowed as business tax deductions under 26 U.S.C. § 274(a) and (e).  Because these fixed operating costs cause a direct financial impact to Jefferies, and because they can be traced to

each Officer Defendant, Jefferies should have included these fixed costs in the Company's calculations of the "aggregate incremental cost" of personal travel for each Officer Defendant.

86.     By omitting these fixed costs, Jefferies has significantly under-disclosed the amount of perquisites (and thus compensation) of the Officer Defendants every year, misleading Jefferies's shareholders as to the true amount of personal use and the costs to shareholders of such personal use.  The table below compares the total amount of aircraft personal use disclosed in Jefferies's proxy statements every year, with the actual disallowed fixed and variable operating costs associated with the personal travel:

| Proxy Disclosure of Personal Use of Aircraft vs. The Disallowed Tax Deductions | | |
|---|---|---|
| Year | Proxy Disclosure of Amount of Aircraft Personal Use by Handler, Friedman and Steinberg | Amount Of Disallowed Tax Deduction Impact Associated With Personal Travel[1] |
| 2015 | $857,424[3] | $5,400,801 |
| 2016 | $902,561[4] | $6,116,696 |
| 2017 | $819,258[5] | $5,583,004 |
| 2018[2] | $763,452[6] | $4,769,596 |
| 2019 | $879,061[7] | $4,900,000 |

(1)  Disallowed Tax Deduction Impact for years 2015, 2016 and 2017 is calculated by multiplying the percentage of personal occupied seat hours against the estimated annual Aircraft operating expenses in each year.  Based on books and records produced by Jefferies, the average annual Aircraft operating expenses are estimated to be $8,268,697.
(2)  For the 11 months through November 30, 2018, the Aircraft operating expenses were $7,566,424, according to books and records produced by Jefferies.
(3)  Includes $276,106 for Handler, $231,663 for Friedman and $349,655 for Steinberg.
(4)  Includes $202,568 for Handler, $349,993 for Friedman and $350,000 for Steinberg.
(5)  Includes $251,911 for Handler, $217,348 for Friedman and $349,999 for Steinberg.
(6)  Includes $350,000 for Handler ($76,705 was separately reimbursed by Handler for personal use of the Aircraft), $63,452 for Friedman, and $350,000 for Steinberg ($164,174 was separately reimbursed by Steinberg for personal use of the Aircraft).
(7)  Includes $260,890 for Handler, $268,171 for Friedman, and $350,000 for Steinberg.

87.     Apart from the above misleading and harmful conduct, Defendants breached their fiduciary duties to the Company and misled shareholders in a second way.  Year after year, in its proxy statements, Jefferies described the Aircraft as "business aircraft."  *See*, *e.g.*, Jefferies proxy statement filed on March 3, 2020, at 52.  Jefferies also repeatedly states that the "[aggregate] [i]ncremental costs do not include depreciation, hanger rent, insurance, flight crew salaries and benefits and other fixed expenses that would have been incurred ***regardless*** of whether there was any personal use of our aircraft."  *Id*. at 55 n.3 (emphasis added).  By repeatedly making this statement, Jefferies implicitly suggested that fixed costs were not being allocated to the Officer Defendants because the majority of use was *business* use, and that personal use was merely incidental.

88.     These statements were misleading.  Personal use constituted close to 70% of total use, thus accounting for the *majority* of use.  Thus, the fixed costs of "depreciation, hanger rent, insurance, flight crew salaries and benefits and other fixed expenses" were expenses that were indisputably and directly incurred *because* of personal use, *not regardless* of personal use.  Specifically, the operating costs of $26,770,097 from 2015 through November 2019 (which were also disallowed as tax deductions) could not possibly be described as expenses that "would have been incurred ***regardless*** of whether there was any personal use of our aircraft." (emphasis added).  By failing to disclose the true costs of personal use, Jefferies's proxy statements were false and misleading.  The proxy statements violated Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 promulgated thereunder.  Because each of the proxy statements issued between 2012 and 2020 were "Solicited On Behalf Of The Board Of Directors," the Board is liable for these violations.  In addition, the Board as a whole breached its fiduciary duties to Jefferies and its shareholders in engaging in these violations.

## VII.   JEFFERIES'S BOARD AND AUDIT COMMITTEE BREACHED THEIR FIDUCIARY DUTIES BY FAILING TO OVERSEE COMPLIANCE AND STOP THE ABUSIVE PERSONAL USE OF JEFFERIES'S AIRCRAFT

89.     Shareholders of all public companies place their trust in the board of directors to represent shareholders' interests when dealing with management.  In theory, a board is supposed to be on the shareholders' side.  In Jefferies's case, that shareholder trust was misplaced.

### A.     Breaches Of Duty By The Audit Committee Defendants In Failing To Oversee Compliance

90.     Under the Jet Usage Policy, the Audit Committee is required to appoint one of its independent directors to oversee compliance with the policy.  Implementation of the policy itself was the responsibility of the Chief Compliance Officer ("CCO") in conjunction with the accounting department.  The Jet Usage Policy states that Jefferies is "committed to compliance with all applicable legal, Internal Revenue Service ('IRS') and Securities and Exchange Commission ('SEC') standards."

91.     Jefferies's Jet Usage Policy provides for an "Aircraft Usage Review," described as follows:

> [A]t least a semi-annual basis, all Leucadia corporate aircraft usage shall be reviewed by the CCO to determine whether such usage was directly and integrally related to the performance of the executive's duties.  To the extent any flight does not so qualify, it shall be classified as personal.  For IRS purposes, any non-business guest shall be classified as personal travel of the executive who invited such guest.

92.     Under the Audit Committee Charter, the purpose of the Audit Committee is to assist the Board in its responsibility to oversee management regarding "the conduct of the Company's financial reporting process, including by overviewing the integrity of the financial reports and other financial information provided by the Company to any governmental or regulatory body," "the Company's legal and regulatory compliance," and "the Company's code of ethics as established by management and the Board."  The Audit Committee is to report regularly to the

Board "on any issues that arise with respect to the quality or integrity of the Company's financial statements" or "the Company's compliance with legal or regulatory requirements."

93.     In the performance of its duties as set forth in its charter and in the Jet Usage Policy, the Audit Committee had access to all the information that it required, including the Aviation Reports.  Specifically, under the Jet Usage Policy, the Company maintained the following information with respect to each flight on the Aircraft: "the names of all passengers, origin, destination, and a description of nature [sic] of the Leucadia-related business purpose, if any."

94.     As part of the semi-annual review of Aircraft usage, the CCO reviewed all flight logs as well as the calculations for, among other purposes, SEC reporting and disclosure. Specifically, as part of the review, the CCO reviewed flight logs "to insure they were properly completed, contained a list of passenger names with sub classifications between business and personal, flight origin, destination, and a classification or business purpose of the flight."  On a semi-annual basis, the CCO discussed the results of his review with the independent director designated by the Audit Committee.  The CCO documented his semi-annual review in a report that was also circulated to the independent director.

95.     Despite the above information and reporting system, the Audit Committee did not apprise itself of the information generated by the reporting system.  There are no minutes of any meeting of the Audit Committee evidencing any discussion of the use of the Aircraft and compliance with the Jet Usage Policy.  The Audit Committee appears to have accepted the conclusory statements contained in the CCO's semi-annual report without question, even though the semi-annual reports were brief (approximately two pages) and contained nearly identical language from one report to the next.  The Audit Committee did not request any of the backup information that was required to be maintained by Jefferies's aviation department, including the

Aviation Reports, flight logs or the calculations for SEC disclosure purposes.   The Audit Committee did not ask about the extent of personal usage of the Aircraft, or whether non-employees were being permitted to commandeer the Aircraft for personal travel at the Company's expense.  The Audit Committee did not ask how the personal usage was being accounted for in the Company's proxy statements, and whether the proxy disclosures were accurate in light of the Officer Defendants' usage.  In short, the Audit Committee's oversight was entirely perfunctory.

96.     By failing to discuss compliance with the Jet Usage Policy at the Audit Committee level, by failing to request and review the information that was required to be maintained under Jefferies's Jet Usage Policy, and by failing to ask the appropriate questions, the Audit Committee Defendants failed to oversee compliance with the policy.  The Audit Committee Defendants acted with a lack of care and in bad faith, consciously disregarded their duty and breached their fiduciary duty.

**B.     Breaches Of Duty By Jefferies's Board And Its Special Committee In Overseeing Compliance And Failing To Stop Abusive Personal Use Of The Aircraft**

97.     In 2018, in response to Plaintiff's demand on the Board to investigate and take action, a Special Committee of the Board (as described further below) was appointed to investigate Plaintiff's claims.  In October 2018, the Special Committee submitted a written report to the Board.

98.     Even after this investigation and report, which identified glaring problems with the use of the Company's Aircraft, the Board and its Special Committee failed to act.  Among other things, the Special Committee's investigation uncovered documents revealing that:

> (a) nearly 70% of total Aircraft use constituted personal use by the Officer Defendants;
>
> (b) the Company's proxy statements were materially misleading because they suggested to shareholders that the Aircraft were "business aircraft" and that the fixed costs of the Aircraft were attributable to the Company's business purposes, "regardless of whether there was any personal use of our aircraft,"

even though the fixed costs of the Aircraft were incurred directly *because* of the high amount of personal use; and

(c) the Officer Defendants had allowed their family members and friends to conduct personal travel on the Aircraft unaccompanied by any Company employee, and entirely at the Company's expense.

99.     The Board and its Special Committee had access to the same documents shared with Plaintiff's counsel, but failed to properly apprise themselves of the import of the information generated from the Special Committee's investigation, and therefore failed to act.

100.    As a result of their torpor, the Board and its Special Committee failed to curtail the amount of personal use (close to 70% of total use) so that the Aircraft could serve the business purposes for which the Aircraft were originally intended.  The Board and its Special Committee failed to take the basic step of prohibiting all personal travel by non-employees on the Company's Aircraft, while unaccompanied by any Company employees.  The Board and its Special Committee also failed to take any action to account for the true costs of the Officer Defendants' personal use, and to demand that the Officer Defendants pay for these costs, even though these costs were directly attributable to the personal use by the Officer Defendants.

101.    Instead, even in the light of the numerous red flags, the Board maintained a generous $350,000 personal travel allowance for each of the Officer Defendants Steinberg, Handler and Friedman.  This was especially egregious given that this allowance is the highest amongst the 14-member peer group carefully selected by Jefferies itself for setting its compensation.  Specifically, of this 14-member peer group, only two other companies have a personal flight allowance, and both have a significantly lower allowance.  The twelve other companies in the peer group have a *zero* personal flight allowance.

102.    The Board and its Special Committee therefore failed to oversee compliance with the Company's policies, including its Jet Usage Policy.  The Board and its Special Committee

31

acted with a lack of care and in bad faith, consciously disregarded their duty and breached their fiduciary duty.

## VIII.  DERIVATIVE AND DEMAND ALLEGATIONS

103.   Plaintiff brings this action derivatively on behalf of the Company to redress injuries that have been suffered and continue to be suffered by the Company as a direct result of the wrongful acts of the Defendants.  Jefferies is named as a nominal defendant solely in a derivative capacity.

104.   Plaintiff fairly and adequately represents the interests of the shareholders of Jefferies that are similarly situated in enforcing the rights of the Company.

105.   As alleged below, Plaintiff has made every reasonable effort to obtain the action Plaintiff desires from the Board prior to instituting this action, to no avail.  Under the circumstances, Plaintiff is entitled to bring this derivative action because his demand has been wrongfully refused.  The Board's demand refusal was wrongful because it was unreasonable, in bad faith and was otherwise in breach of the Board's fiduciary duties.

### A.   Plaintiff's Books And Records Demands And Jefferies's Response

106.   On September 19, 2017, Plaintiff served a books and records demand on the Company pursuant to New York common law and BCL § 624.  Based on Plaintiff's investigation, Plaintiff suspected that Jefferies's proxy statement disclosures were materially false and misleading with respect to the personal use of the Company's Aircraft by Steinberg, Handler and Friedman.

107.   On October 27, 2017, Jefferies responded by producing just one page.  The single page comprised Jefferies's Jet Usage Policy.  The one-page policy was inadequate for the Company's needs.  It did not state such basic details as who could use the Aircraft, or the purposes (business or personal) for which the Aircraft could be used.  Importantly, the policy did not even

prohibit non-employees from using the Aircraft for personal travel while unaccompanied by any Company employee.

108.    Jefferies adopted an aggressive position from the start.  Jefferies dismissed, without investigation, Plaintiff's allegations of misconduct.  Jefferies also made specious arguments that the one-page production fully satisfied the Company's obligations to provide inspection under New York common law, and questioned Plaintiff's standing.

109.    On December 21, 2017, after nearly two months of negotiation, Jefferies made a limited, supplemental production.  The production contained documents showing that in 2012, another shareholder, Central Laborers, investigated Jefferies and negotiated a settlement under which Jefferies adopted the deficient one-page policy, and paid Central Laborers' counsel $100,000 in attorneys' fees.  The settlement constituted a gross dereliction of duty by Jefferies's Board.  Despite being presented with the opportunity, the Board failed to implement a comprehensive aircraft policy or take other corrective measures, and instead did the bare minimum in order to make Central Laborers go away.

110.    Despite repeated requests, Jefferies refused to provide Plaintiff with any documents apart from the above limited set of documents.  Specifically, Jefferies refused Plaintiff's request for the Company's flight logs and for Jefferies's calculations of the disallowed tax deductions attributable to personal use.  After further negotiation, on December 29, 2017, Jefferies's counsel proposed that Plaintiff's counsel compile a list of flights, for just the 2016 year, that Plaintiff's counsel believed to be incorrectly classified, so that Jefferies could investigate and provide its response.

111.    On January 30, 2018, during a telephonic conference call, Jefferies's counsel proceeded to provide oral explanations as to the purported business purpose for certain 2016 flights

flagged by Plaintiff's counsel, but did not attempt to support these explanations with any books and records.

### B.   Plaintiff's March 6, 2018 Litigation Demand On Jefferies's Board

112.   On March 6, 2018, because of Jefferies's repeated efforts to obstruct and frustrate Plaintiff's investigation, Plaintiff made a demand directly on the Board ("Demand") to investigate the personal use of the Aircraft, and the Company's public disclosures of such use.  In the Demand, Plaintiff alleged that personal flights had been misclassified as business flights, and that Jefferies had issued materially false and misleading proxy statements to shareholders with respect to the amount of personal use.

113.   On April 4, 2018, the Board formed a Special Committee to investigate the allegations in the Demand.  The Special Committee proceeded to conduct an investigation from May 2018 through October 2018.  The Special Committee was assisted by outside counsel, Boies Schiller Flexner LLP ("Boies Schiller").

### C.   The Special Committee's Findings Confirm Plaintiff's Claims Against The Company

114.   In October 2018, the Special Committee reported its findings and recommendations to the Board.  *See Report of the Special Committee to the Non-Executive Directors Related to the Company's Flight Program*, presented to the Board on October 25, 2018 ("Special Committee Report").  Specifically, the Special Committee:

- Recommended that Steinberg should reimburse the Company the net amount of $235,928.90, based on personal flights that had been misclassified as "business."

- Recommended revisions to the Company's Jet Usage Policy, specifically, by adding a new set of guidelines for how to classify flights as business/personal.

- Recommended that "relevant Company employees with duties and responsibilities related to the Flight Program receive refresher training on applicable rules and guidelines."

34

Based on the Special Committee's presentation, the Board adopted these recommendations.

115.   At a meeting held on January 22, 2019, the Special Committee also addressed another of Plaintiff's claims and recommended to the Board that the Company disclose the amount of the disallowed tax deductions attributable to personal use.   The Board adopted this recommendation, which is reflected in the Company's February 15, 2019 and March 3, 2020 proxy statements.  Although the amount of the disallowed tax deduction is now disclosed, it is still not allocated to any of the Officer Defendants as part of their perquisite compensation.  As a result, the proxy statements still do not disclose the costs of personal use that are attributable to each of the Officer Defendants.

116.   The actions of the Special Committee and the Board confirmed Plaintiff's central claims that: (a) personal flights had been misclassified as business flights, and (b) the Company's proxy statements failed to properly disclose the amount of personal use by the Officer Defendants, and the costs of such personal use attributable to the Officer Defendants.

### D.   The Board Otherwise Rejected Plaintiff's Demand

117.   Despite its findings, the Special Committee concluded that "the Company should not bring any legal claims against Messrs. Handler, Friedman or Steinberg."   Apart from the actions described above, the Special Committee did not recommend any other corrective steps.

118.   Accordingly, at the meeting of the Board held on October 25, 2018, the Board "elected to accept the Special Committee's recommendation to reject the demands made in the [Demand]" (hereafter, the Board's "Demand Refusal").

E.   **Plaintiff Demands Inspection Of Jefferies's Books and Records Relating To The Board's Demand Refusal**

119.   On May 6, 2019, Jefferies produced to Plaintiff the Special Committee Report, the minutes of the meetings of the Special Committee, and the minutes of the Board meeting at which the Special Committee's recommendations were adopted.

120.   Even with this production, Jefferies still continued to withhold a large number of documents related to the Special Committee Report, and which Plaintiff and his counsel were entitled to inspect.  The withheld documents included flight records and disallowed tax deduction calculations that had been reviewed by the Special Committee.

121.   It was not until August 12, 2019 and August 22, 2019, after extensive correspondence back and forth, that Jefferies made a further production of documents, comprising Jefferies's flights records for the period 2015 through 2017, and Jefferies's disallowed tax deductions calculations for the eleven-month period from January 2018 to November 2018.

122.   Even with this production, Jefferies continued to withhold critically relevant documents.  Specifically, Jefferies refused to disclose the disallowed tax deduction calculations for any year except 2018, even though the Company possessed this data in its books and records, as required under federal tax regulations.  Additionally, Jefferies refused to produce flights records for years 2012 through 2014, or for more recent years.

F.   **The Demand Refusal Was Wrongful**

123.   The Board and the Special Committee's rejection of Plaintiff's Demand was wrongful because the Board and the Special Committee failed to adequately inform themselves of material information, and therefore acted unreasonably.  In addition, the Board and the Special Committee placed the interests of the Officer Defendants above the interests of the Company, and therefore acted in bad faith and breached their duty of loyalty.

124.    First, the Special Committee failed to adequately inform itself as to who was actually using the Aircraft, and whether the use complied with the Company's internal policies. In the course of its investigation, the Special Committee and its counsel Boies Schiller had access to flight logs detailing the flights made by the Officer Defendants, the origin and destination of those flights, and the passengers on board each flight.  Plaintiff obtained some of these flight logs from Jefferies in the productions made on August 12 and August 22, 2019.  The flight logs showed that there were numerous instances of personal flights on the Aircraft by non-employees, specifically, family members and friends of the three Officer Defendants, with no employees on board the flights.  These flights did not benefit the Company and cost the Company hundreds of thousands of dollars.  Even worse, the costs were not deductible as a business expense.  Allowing outsiders to use the Company's expensive Aircraft at the Company's sole expense also violated the Company's Code of Business Practice ("Protection and Proper Use of Company Assets"), which expressly states: "*All employees, officers and directors should protect the Company's assets and ensure their efficient use.  Theft, carelessness and waste have a direct impact on the Company's profitability*."

125.    In other words, the Special Committee and Boies Schiller possessed information indicating corporate looting and violation of Company policy by the Officer Defendants.  Despite this, and as evidenced by the Special Committee Report, the Special Committee and Boies Schiller did not perform any investigation of this issue.  As a result, the Special Committee Report omits any mention of these unaccompanied, non-employee personal flights, and does not even contain a basic recommendation to prohibit all such flights.  In this manner, the Special Committee (and the Board) failed to adequately inform themselves of all material information and acted unreasonably in rejecting the Demand.  The Special Committee and the Board also acted in bad faith, because

they elevated the interests of the Officer Defendants, and their family members and friends, above the interests of the Company.

126.    Second, the Special Committee failed to adequately inform itself as to the true extent of personal use of the Aircraft by the Officer Defendants.  In the course of its investigation, the Special Committee had access to granular data concerning the number of flights taken by the Officer Defendants for personal purposes, relative to the total number of flights made on the Aircraft, and the number of "occupied seat hours" of the Officer Defendants' personal flights relative to total "occupied seat hours."  Based on this granular data, the Special Committee had information in its possession that indicated personal travel by the Officer Defendants accounted for close to 70% of all travel.

127.    However, as evidenced by the Special Committee Report, the Special Committee inexplicably failed to apprise itself of this material information.  The Special Committee Report nowhere states that personal use by the Officer Defendants constituted close to 70% of total use. As a result, the Special Committee failed to inquire whether it was appropriate to maintain an expensive corporate fleet when close to 70% of the use was personal use, and when the data suggested that it was not even necessary to have three planes.  Furthermore, the Special Committee failed to investigate whether the Company's proxy statement disclosures were correct in light of the extensive personal use.  For example, because personal travel accounted for close to 70% of all travel, the Company's proxy disclosures were materially false and misleading when repeatedly describing the Aircraft as "business aircraft."  In addition, the Special Committee failed to inquire whether it was appropriate to maintain the generous $350,000 allowance for personal Aircraft use for each Officer Defendant.

128.    Third, the Special Committee failed to adequately inform itself as to the true costs of the personal use of the Aircraft by the Officer Defendants.  Based on its investigation, the Special Committee had access to granular costs information indicating the percentage of total Aircraft use that was attributable to the Officer Defendants' personal use, the percentage of Jefferies's flight department operating costs that were attributable to the personal use, and therefore the amount of disallowed tax deductions directly attributable to personal travel by each Officer Defendant.  This information indicated that the non-tax-deductible costs attributable to the Officer Defendants' personal use amounted to millions of dollars a year.

129.    However, the Special Committee inexplicably failed to apprise itself of this material information.  As a result, the Special Committee failed to investigate whether, in light of the extensive personal use and millions of dollars in associated costs, these costs (including fixed costs) should be attributed to the Officer Defendants and disclosed as part of these officers' compensation in the Company's proxy statements.  Furthermore, the Special Committee failed to inquire whether it was still correct for the Company to repeatedly assure investors in the proxy statements that the "[aggregate] [i]ncremental costs [of personal use] do not include depreciation, hanger rent, insurance, flight crew salaries and benefits and other fixed expenses that would have been incurred *regardless* of whether there was any personal use of our aircraft."  *See* proxy statement, filed on March 3, 2020, at 55 n.3 (emphasis added).  Here, because the personal use constituted the *majority* of use, the fixed costs indisputably were incurred directly *because* of personal use.  Based on all these failures, the Special Committee acted unreasonably by not informing itself of all material information, and acted in bad faith by elevating the interests of the Officer Defendants above the interests of the Company.

130.    Fourth, as alleged in Section V above, Defendant Handler made numerous international flights that Jefferies classified as "business," even though Handler's social media postings indicate that the flights were really made in connection with personal travel by Handler and his family and friends.  The Special Committee had access to the Aviation Reports, as well as Handler's publicly available social media postings.  However, the Special Committee failed to properly apprise itself of this material information.  Despite the information contained in Handler's social media postings, the Special Committee did not require Handler to make any reimbursements to the Company for any improperly misclassified flights, and only obtained reimbursements from Defendant Steinberg.  Accordingly, the Special Committee acted unreasonably by not informing itself of all material information, and acted in bad faith by elevating the interests of the Officer Defendants, including Handler, above the interests of the Company.

## CAUSES OF ACTION

### COUNT I
**Breach Of The Fiduciary Duty Of Loyalty – Misuse Of Corporate Assets**
**(Asserted Against Officer Defendants Friedman, Handler and Steinberg)**

131.    Plaintiff incorporates by reference and realleges each and every allegation above as if fully set forth herein.

132.    The Officer Defendants Friedman, Handler and Steinberg, as directors and officers of the Company, owed the Company and its shareholders a fiduciary duty of loyalty.

133.    The Officer Defendants made personal flights and/or allowed friends and family members to make personal flights on Jefferies's Aircraft that amounted to nearly 70% of the total use of the Aircraft.  This abusive use of expensive corporate assets cost the Company tens of millions of dollars since at least 2012.  These costs were, additionally, not deductible by the Company under the federal tax code.

134.    The personal use also violated Jefferies's Code of Business Practice, which explicitly states that: "All employees, officers and directors should protect the Company's assets and ensure their efficient use.  Theft, carelessness and waste have a direct impact on the Company's profitability."

135.    As further alleged herein, the Officer Defendants' abusive personal use was even more egregious because it was concealed from shareholders.  The extent of personal travel was not accurately disclosed and not properly attributed to the Officer Defendants in the Company's proxy statements.

136.    By reason of the foregoing acts, practices and course of conduct, and as alleged herein, the Officer Defendants have failed to exercise good faith and breached their duty of loyalty to Jefferies and its shareholders.

137.    As a direct and proximate result of the Officer Defendants' breaches of their fiduciary duty of loyalty, the Company has sustained, and will continue to sustain, substantial harm.

138.    The Officer Defendants are liable to the Company for damages as a result of the acts alleged herein.

<u>**COUNT II**</u>
**Breach Of Fiduciary Duties Of Care And Loyalty –**
**Approval Of Misuse of Corporate Assets**
**(Asserted Against The Director Defendants)**

139.    Plaintiff incorporates by reference and realleges each and every allegation above as if fully set forth herein.

140.    The Director Defendants, as directors of the Board of Jefferies, owed the Company and its shareholders the fiduciary duties of care and loyalty.

41

141.    Additionally, the Compensation Committee Defendants had specific, heightened duties of care and loyalty.  According to the Compensation Committee Charter, the Compensation Committee has the duty "to advise senior management on the administration of the Company's compensation programs, review and approve the compensation the Executive Officers of the Company."  Among other responsibilities, the Compensation Committee is required to "[a]ssist with regulatory compliance with respect to compensation matters, including overseeing the Company's policies on structuring compensation programs to preserve tax deductibility, and, as and when required, establishing performance goals and certifying that performance goals have been attained."

142.    The Director Defendants, including the Compensation Committee, breached their fiduciary duties by approving, on December 3, 2012, a barebones, one-page Jet Usage Policy that contained no restrictions on the personal travel by the Officer Defendants, and that did not even contain a basic statement that the Aircraft were intended to be used for business travel.  Despite being presented with the concerns of a shareholder of the Company, the Board failed to conduct a proper investigation and approved a one-page policy in order to bury the shareholder's investigation, without making any changes to the Company's corporate jet practices.

143.    By reason of the foregoing acts, practices and course of conduct, and as alleged herein, the Director Defendants breached their duty of care by failing to act with reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances.  In addition, the Director Defendants failed to exercise good faith and breached their duty of loyalty to Jefferies and its shareholders.  Among other breaches, the Director Defendants consciously disregarded their responsibilities, engaged in willful misconduct and were reckless.

144.     As a direct and proximate result of the Director Defendants' breaches of the fiduciary duties of care and loyalty, the Company has sustained, and will continue to sustain, substantial harm.

145.     The Director Defendants are liable to the Company for damages as a result of the acts alleged herein.

<u>**COUNT III**</u>
**Derivative Claim For Issuing Misleading Proxy Statements
In Violation Of Section 14(a) Of The Exchange Act And Rule 14a-9
(Asserted Against All Director Defendants)**

146.     Plaintiff incorporates by reference and realleges each and every allegation above as if fully set forth herein.

147.     The Director Defendants caused Jefferies to issue proxy statements for each of the fiscal years since 2012 to solicit shareholder votes for the election of directors and the approval of executive compensation.  The Director Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the U.S. mail, interstate telephone communications, or the facilities of a national securities exchange in connection with soliciting shareholder votes as requested in the proxy statements.

148.     The proxy statements contained materially false and misleading disclosures that misled Jefferies's shareholders.  Among other matters, the proxy statements omitted to disclose the true extent of personal use of the Jefferies Aircraft and the true costs of this personal use. Despite the fact that the Officer Defendants' personal use of the Jefferies Aircraft averaged close to 70% of total use, the proxy statements failed to include a portion of the fixed costs when reporting the "aggregate incremental costs" of the Officer Defendants' personal use.  The proxy statements also repeatedly and falsely stated that the Aircraft were "business aircraft," and that the "[aggregate] [i]ncremental costs do not include depreciation, hanger rent, insurance, flight crew

salaries and benefits and other fixed expenses that would have been incurred *regardless* of whether there was any personal use of our aircraft." As alleged herein, because the personal use constituted the *majority* of use, the fixed costs (which were non-deductible) indisputably were incurred directly *because* of personal use.

149.   The inaccuracies and omissions in each proxy statement concerned matters of material importance to the Company and its shareholders who were requested to vote on Board recommendations to re-elect directors and approve executive compensation, including the compensation of the Officer Defendants.

150.   Defendants' failure to include these material facts in the proxy statements rendered them materially false and misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

151.   The materially false and misleading proxy statements were an essential link in the abusive personal use of the Aircraft by the Officer Defendants, and the diversion of millions of dollars from the Company to the Officer Defendants. Because of the inaccuracies and omissions in each proxy statement, every year, Jefferies's shareholders approved the compensation of the Officer Defendants, including the perquisite by which the Officer Defendants were permitted to use the Aircraft for personal purposes, and the annual $350,000 allowance for personal use for each Officer Defendant. Because of the inaccuracies and omissions in each proxy statement, shareholders did not and could not possibly know that the costs of the personal use was millions of dollars higher than the amounts disclosed in the proxy statements, or that family members and friends of the Officer Defendants were allowed to commandeer the Aircraft for travel unrelated to the business of the Company, without any Company employee on board, and at the expense of the Company. In addition, if the truth had been disclosed in the proxy statements, shareholders would

have ended their endorsement of the Director Defendants as fiduciaries, which would have terminated the abusive use of the Aircraft.

152.    As a direct and proximate result of the materially false and misleading proxy statements, Jefferies suffered and continues to suffer direct and significant harm, including tens of millions of dollars in unreimbursed Aircraft costs.

153.    The Director Defendants are liable to Jefferies for damages as a result of the acts alleged herein.

154.    This count is only alleged against the Director Defendants as to those proxy statements that were issued during their terms as directors on the Board.

### COUNT IV
**Breach Of The Fiduciary Duties Of Care And Loyalty –
Disseminating Materially False And Misleading Statements
(Asserted Against All Director Defendants)**

155.    Plaintiff incorporates by reference and realleges each and every allegation above as if fully set forth herein.

156.    The Director Defendants, as directors of the Company, owed the Company and its shareholders the fiduciary duties of care and loyalty to ensure that Jefferies disseminated accurate, truthful and complete information to its shareholders.

157.    The Director Defendants violated their fiduciary duties of care and loyalty by causing or allowing the Company to disseminate to Jefferies shareholders materially false and incomplete information, including in the Company's proxy statements.  Among other matters, the proxy statements omitted to disclose the true extent of personal use of the Jefferies Aircraft and the true costs of this personal use.  Despite the fact that the Officer Defendants' personal use of the Jefferies Aircraft averaged close to 70% of total use, the proxy statements failed to include a portion of the fixed costs when reporting the "aggregate incremental costs" of the Officer

Defendants' personal use.  The proxy statements also repeatedly and falsely stated that the Aircraft were "business aircraft," and that the "[aggregate] [i]ncremental costs do not include depreciation, hanger rent, insurance, flight crew salaries and benefits and other fixed expenses that would have been incurred *regardless* of whether there was any personal use of our aircraft."  As alleged herein, because the personal use constituted the *majority* of use, the fixed costs (which were non-deductible) indisputably were incurred directly *because* of personal use.

158.    The Director Defendants' actions could not have been a good faith exercise of prudent business judgment.

159.    As a direct and proximate result of the Director Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT V
### Breach Of Fiduciary Duty For Failure Of Oversight
### (Asserted Against The Audit Committee Defendants)

160.    Plaintiff incorporates by reference and realleges each and every allegation above as if fully set forth herein.

161.    The Audit Committee Defendants, as directors of the Company, owed the Company and its shareholders the fiduciary duty of care and loyalty.

162.    Under Jefferies's Jet Usage Policy, the Audit Committee was required to appoint one of the committee's members to oversee compliance with the policy.  Additionally, under the Audit Committee Charter, the purpose of the Audit Committee is to assist the Board in its responsibility to oversee management regarding "the conduct of the Company's financial reporting process, including by overviewing the integrity of the financial reports and other financial information provided by the Company to any governmental or regulatory body," "the Company's legal and regulatory compliance," and "the Company's code of ethics as established by management and the Board."  The Audit Committee is required to report regularly to the Board

"on any issues that arise with respect to the quality or integrity of the Company's financial statements" or "the Company's compliance with legal or regulatory requirements."

163.   The Audit Committee had access to all the information that it required to perform its duties.  Specifically, under the Jet Usage Policy, the Company was required to maintain, with respect to each flight on the Aircraft, "the names of all passengers, origin, destination, and a description of nature [sic] of the Leucadia-related business purpose, if any."   Further, the Company's CCO conducted a semi-annual review of compliance with the Jet Usage Policy, in the course of which he reviewed all flight logs as well as the Company's calculations for SEC disclosure and reporting purposes.  On a semi-annual basis, the CCO discussed the results of his review with the independent director designated by the Audit Committee.  The CCO documented his semi-annual review in a report that was also circulated to the independent director.

164.   Despite the above information and reporting system, the Audit Committee failed to apprise itself of the information generated by the reporting system.  The Audit Committee did not discuss, at the committee level, the Officer Defendants' compliance with the Jet Usage Policy. The Audit Committee accepted the conclusory statements contained in the CCO's semi-annual report without question, even though the semi-annual reports were brief (approximately two pages), and contained nearly identical language from one report to the next.  The Audit Committee did not request any of the backup information that was required to be maintained by Jefferies's aviation department, including the Aviation Reports, flight logs or the calculations for SEC disclosure purposes.

165.   Accordingly, the Audit Committee Defendants repeatedly failed to provide oversight and failed to investigate or otherwise inquire into: (a) what percentage of total use of the Company's Aircraft was personal use, and whether personal use was displacing legitimate business

use; (b) what were the true costs to the Company of this extensive and abusive personal use, especially given that the costs of personal use were disallowed as tax deductions; (c) whether the Company was properly accounting for all the costs attributable to the personal use and correctly disclosing these costs in the proxy statements; and (d) who was being permitted to fly on the Aircraft, and whether, in breach of the Company's Code of Business Practice, friends and family members of Jefferies's senior officers were being permitted to use the Aircraft unaccompanied by any Jefferies employee for reasons unrelated to the business of Jefferies.

166.    By reason of the foregoing acts, practices and course of conduct, and as alleged herein, the Audit Committee Defendants breached their fiduciary duties by failing to oversee the Company's Aircraft usage with reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances.  The Audit Committee Defendants acted in bad faith, consciously disregarded their responsibilities, engaged in willful misconduct and were reckless.

167.    As a direct and proximate result of the Audit Committee Defendants' breaches of fiduciary duty, the Company has sustained, and will continue to sustain, substantial harm.

168.    The Audit Committee Defendants are liable to Jefferies for damages as a result of the acts alleged herein.

## COUNT VI
### Breach Of Fiduciary Duty For Failure Of Oversight
### (Asserted Against All Director Defendants)

169.    Plaintiff incorporates by reference and realleges each and every allegation above as if fully set forth herein.

170.    In October 2018, the Board was presented with the results of the Special Committee's investigation conducted from April to October 2018.  Even after being presented with

numerous red flags in the Special Committee Report, the Director Defendants failed to make any changes to the Jet Usage Policy.

171.    Among the red flags, the Special Committee Report contained information indicating that close to 70% of the use of the Aircraft was personal travel by the Officer Defendants and their family members and friends; that the Officer Defendants had allowed the Aircraft to be commandeered by the Officer Defendants' family members and friends for personal travel, at the Company's expense; and that the Officer Defendants' personal travel cost the Company tens of millions of dollars in expenses, which expenses were not deductible under the federal tax code.

172.    The Special Committee and the Board failed to apprise themselves of, and to understand, this information generated by the Special Committee's investigation.

173.    As a result, the Board and the Special Committee maintained the Company's Jet Usage Policy and corporate jet practices without any modifications or restrictions to the travel of the Officer Defendants.  The Director Defendants also failed to investigate: (a) what percentage of total use of the Company's Aircraft was personal use, and whether personal use was displacing legitimate business use; (b) what were the true costs to the Company of this extensive and abusive personal use, especially given that the costs of personal use were disallowed as tax deductions; (c) whether the Company was properly accounting for all the costs attributable to the personal use and correctly disclosing these costs in the proxy statements; and (d) who was being permitted to fly on the Aircraft, and whether, in breach of the Company's Code of Business Practice, friends and family members of Jefferies's senior officers were being permitted to use the Aircraft unaccompanied by any Jefferies employee for reasons unrelated to the business of Jefferies.

174.    The Director Defendants additionally breached their fiduciary duties by maintaining the $350,000 personal use allowance for each of the Officer Defendants Steinberg,

Handler and Friedman. Despite setting compensation at Jefferies by examining the compensation practices of a carefully selected peer group of 14 companies, the Director Defendants failed to even examine this peer group to ascertain their corporate jet practices. The Director Defendants therefore failed to apprise themselves that, of this 14-member peer group, only two other companies have a personal flight allowance, and both have a lower allowance. The twelve other companies have a zero personal flight allowance.

175.    By reason of the foregoing acts, practices and course of conduct, and as alleged herein, the Director Defendants breached their fiduciary duties by failing to oversee the Company's Aircraft usage with reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances. The Director Defendants acted in bad faith, consciously disregarded their responsibilities, engaged in willful misconduct and were reckless.

176.    As a direct and proximate result of the Director Defendants' breaches of fiduciary duty, the Company has sustained, and will continue to sustain, substantial harm.

177.    The Director Defendants are liable to Jefferies for damages as a result of the acts alleged herein

**COUNT VII**
**Corporate Waste**
**(Asserted Against All Director Defendants)**

178.    Plaintiff incorporates by reference and realleges each and every allegation above as if fully set forth herein.

179.    The Director Defendants repeatedly approved the abusive personal use of the Aircraft, even though it violated the Company's Code of Business Practice and other internal policies.

180.    In allowing the Officer Defendants to conduct personal travel that comprised close to 70% of total use of the Aircraft, each of the Director Defendants irrationally squandered and

gave away corporate assets, without any consideration from the Officer Defendants.  In particular, the Director Defendants allowed non-employees (*i.e.*, family members and friends of the Officer Defendants) to use the Aircraft, unaccompanied by any Company employee, for purposes unrelated to the Company's business and with no discernible benefit to the Company, and entirely at the Company's expense.  As such, the Director Defendants allowed Steinberg, Handler and Friedman to appropriate Jefferies's expensive corporate assets for their own private ends.

181.    Based on the foregoing conduct, the Director Defendants committed corporate waste.

182.    As a direct and proximate result of the above conduct, the Company has sustained, and will continue to sustain, substantial harm.

183.    The Director Defendants are liable to the Company for damages as a result of the acts alleged herein.

## COUNT VIII
### Unjust Enrichment
### (Asserted Against The Officer Defendants)

184.    Plaintiff incorporates by reference and realleges each and every allegation above as if fully set forth herein.

185.    The Officer Defendants made personal flights and/or allowed family members and friends to make personal flights on Jefferies's Aircraft that violated the Company's Code of Business Practice, which explicitly states that "[a]ll employees, officers and directors should protect the Company's assets and ensure their efficient use.  Theft, carelessness and waste have a direct impact on the Company's profitability."  The Officer Defendants made personal flights and/or allowed family members and friends to make personal flights on the Aircraft whose costs were borne solely by the Company, and which costs were not accurately reported and were not

properly attributed to the Officer Defendants in the Company's proxy statements for each of the fiscal years since 2012.

186.    Because personal use regularly comprised close to 70% of total Aircraft use, a portion of the fixed costs attributable directly to the personal use should have been allocated to each of the Officer Defendants.  However, the costs of the Officer Defendants' personal use were not accurately reported in the Company's proxy statements and/or not properly attributed to the Officer Defendants.

187.    By reason of the foregoing acts, practices and course of conduct, profits and benefits were conferred on and received by the Officer Defendants.

188.    The Officer Defendants voluntarily accepted and retained these profits and benefits.

189.    As a direct and proximate result of the acts alleged herein, the Officer Defendants wrongfully deprived the Company of substantial wealth and unjustly enriched themselves, and the Company has sustained, and will continue to sustain, substantial harm.

190.    The Officer Defendants are liable to the Company for damages as a result of the acts alleged herein, and should be required to disgorge their unjust gains and return them to the Company.

<u>**COUNT IX**</u>
**Aiding And Abetting Breaches Of The Duties Of Care And Loyalty**
**(Asserted Against All Defendants)**

191.    Plaintiff incorporates by reference and realleges each and every allegation above as if fully set forth herein.

192.    As alleged above, Defendants breached their fiduciary duties of care and loyalty to Jefferies and its shareholders, engaged in corporate waste and were unjustly enriched.

193.    In committing the wrongful acts alleged herein, Defendants have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.

194.    At all relevant times, Defendants collectively and individually initiated a course of conduct which was designed to and did repeatedly and intentionally: (a) violate Jefferies's Jet Usage Policy and Code of Business Practice; (b) mislead Jefferies's shareholders about the true extent of personal use of Jefferies Aircraft and the true costs of this use; and (c) amounted to corporate waste.

195.    The purpose and effect of Defendants' common course of conduct was, among other things, to disguise Defendants' violations of law and breaches of fiduciary duty and allow Jefferies's officers and directors to continue to violate Company policy and to receive excessive and undisclosed compensation.

196.    Each of Defendants was a direct, necessary and substantial participant in the common enterprise and/or common course of conduct complained of herein, and each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

197.    As a direct and proximate result of the Defendants' aiding and abetting one another's breaches of fiduciary duty, the Company has sustained, and will continue to sustain substantial harm.

198.    Defendants are liable to Jefferies for damages as a result of the acts alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

(a)     Declaring Plaintiff to be a proper derivative representative of Jefferies;

(b)     Awarding to the Company money damages against Defendants jointly and severally, for all losses suffered as a result of the acts and transactions complained of herein;

(c)     Awarding to the Company restitution from all Defendants, and ordering disgorgement of all benefits and other compensation obtained by the Defendants Friedman, Handler and Steinberg through personal use of the Aircraft that was not fully reimbursed and/or not accurately reported in the Company's proxy statements;

(d)     Injunctive relief requiring Defendants to disclose the correct "aggregate incremental costs" of personal use of the Aircraft, including a portion of the fixed costs allocable to personal flights on the Aircraft, and requiring Defendants to correct all proxy statements for prior fiscal years to disclose these same costs;

(e)     Awarding punitive damages against Defendants;

(f)     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(h)     Granting such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated:  April 1, 2020

HUNG G. TA, ESQ. PLLC
Hung G. Ta, Esq.
JooYun Kim, Esq.
Natalia Williams, Esq.
250 Park Avenue, Seventh Floor
New York, NY 10177
Tel:       (646) 453-7288
Fax:       (646) 453-7289

SAFIRSTEIN METCALF LLP
Peter Safirstein, Esq.
Elizabeth S. Metcalf, Esq.
350 Fifth Avenue, 59th Floor
New York, NY 10118
Tel: (212) 201-2855

*Counsel for Plaintiff*

55

## VERIFICATION

I, Stanley Rubenstein, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint"), and I authorize its filing. The Complaint is true and correct to the best of my knowledge, information and belief. As to those allegations of which I have personal knowledge, I believe the allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel's investigation and also believe those allegations to be true. I am a holder of Jefferies Financial Group, Inc. ("Jefferies") common stock, and I was a continuous holder of Jefferies common stock during the period that is the subject of the allegations in the Complaint. I declare under penalty of perjury that the foregoing is true and correct.

DATE:  April 1, 2020

Dr. Stanley M. Rubenstein

Stanley Rubenstein