UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
:
STANLEY RUBENSTEIN, Derivatively on          :
Behalf of Nominal Defendant JEFFERIES        :
FINANCIAL GROUP INC.,                        :
:
Plaintiff,          :
:                    20-CV-2775 (PAC)
-against-          :
:
LINDA L. ADAMANY, BARRY J.                   :                    **OPINION & ORDER**
ALPERIN, ROBERT D. BEYER,                    :
FRANCISCO L. BORGES, W. PATRICK              :
CAMPBELL, PAUL M. DOUGAN, BRIAN              :
P. FRIEDMAN, MARYANNE GILMARTIN,             :
RICHARD B. HANDLER, ALAN J.                  :
HIRSCHFIELD, JAMES E. JORDAN,                :
ROBERT E. JOYAL, JACOB M. KATZ,              :
JEFFREY C. KEIL, MICHAEL T. O'KANE,          :
JESSE CLYDE NICHOLS, III, STUART H.          :
REESE, MICHAEL SORKIN, JOSEPH S.             :
STEINBERG,                                   :
:
Defendants,          :
:
JEFFERIES FINANCIAL GROUP INC.,              :
:
Nominal Defendant.          :
:
------------------------------------------------------------X

This case concerns allegations of corporate abuse and waste with respect to travel on

corporate jets by senior officers of Jefferies Financial Group Inc. ("Jefferies" or "the Company").

Plaintiff Stanley Rubenstein, an Alabama resident and a shareholder of Jefferies, brings this

derivative lawsuit against three senior officers ("Officers") and the board of directors ("Board")

of the Company (collectively, "Defendants").[1]  Rubenstein alleges that, since 2012, the Officers have made excessive personal use of the Company's corporate aircraft program, causing millions of dollars in losses to shareholders, and that the Board has failed to adequately monitor and investigate this wrongdoing, in breach of their fiduciary duties.

Before filing this derivative lawsuit in federal court, Rubenstein made a written demand on the Board to investigate and commence legal action against the Officers.  The Board responded by forming an independent committee ("Special Committee") to investigate the allegations contained in Rubenstein's litigation demand.  After a six-month long investigation, the Special Committee recommended that the Board decline to pursue legal measures; the Board adopted this recommendation and this derivative lawsuit followed.

Defendants move to dismiss, arguing that the Board's refusal to litigate was based on an adequate investigation by the Special Committee and thus protected under New York law's business judgment rule.  For the reasons set forth below, the motion is **GRANTED**.

## BACKGROUND

### I.     Factual Background

The following facts are taken from the complaint and assumed true for purposes of this motion.[2]  Plaintiff Stanley Rubenstein is a resident of Alabama[3] who has been a shareholder of nominal defendant, Jefferies, since March 2017.  (Compl. ¶ 11, ECF 5.)  Jefferies is a diversified

---

[1] The Board is comprised of past and present Jefferies directors who have served at various points between 2012 to the present.  Because the Officers are also members of the Board, the Board represents the entire class of defendants in this action.

[2] On this motion to dismiss, the Court may consider documents that are attached as exhibits, incorporated by reference, or integral to the complaint.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

[3] The Court has diversity jurisdiction over this case because there is complete diversity between the parties.  28 U.S.C. § 1332.  Alternatively, the Court has federal question jurisdiction over Rubenstein's Section 14(a) claim and supplemental jurisdictional over the state law claims.  *See* 28 U.S.C. §§ 1331, 1367.

holding company, existing under the laws of New York, that "owns a diverse range of businesses" including those providing financial services. (*Id.* at ¶ 12.)

At all relevant times, Jefferies maintained a corporate aircraft fleet ("Flight Program") consisting of three planes: the N91LA, N92LA, and N93LA. (*Id.* at ¶ 47.) The N91LA and N92LA are Gulfstream GV-SPs with a seating capacity of twenty; and the N93LA is a Bombardier Challenger with a seating capacity of eight. (*Id.*) On average, Jefferies expends $8.3 million each year to maintain the Flight Program. (*Id.* at ¶ 56.)

In 2012, in response to another shareholder demand to investigate allegations of corporate wrongdoing, the Board ratified a one-page jet usage policy ("Jet Policy") to regulate the Flight Program. (*Id.* at ¶¶ 48–51.) The Company's Audit Committee and Chief Compliance Officer (CCO) are responsible for implementing the Jet Policy. (*Id.* ¶ 90.) Notably, the Jet Policy does not restrict private use of the Flight Program by Jefferies' directors and officers, or their "non-employee family members and friends[.]" (*Id.* at ¶¶ 50, 142.) It, however, requires the costs of these private uses to be remitted back to the Company.[4] (*Id.* at ¶¶ 58–62.)

The Jet Policy contains internal controls to distinguish private use of the Flight Program from official business use. The policy provides:

> [A]t least [on] a semi-annual basis, all [Jefferies] corporate aircraft usage shall be reviewed by the CCO to determine whether such usage was directly and integrally related to the performance of the executive's duties. To the extent any flight does not so qualify, it shall be classified as personal. For IRS purposes, any non-business guest shall be classified as personal travel of the executive who invited such guest.

(*Id.* at ¶ 91.)

---

[4] The Jet Policy only requires variable costs (e.g. the cost of fuel) of personal usage to be remitted to the Company. (Compl. ¶ 80, ECF 5.) It does not charge fixed costs (e.g. aircraft depreciation, pilot and crew salaries, hangar fees, insurance, and maintenance costs) incurred by private use. (*Id.* at ¶ 56.)

To carry out this policy, Jefferies maintains internal aviation reports that describe the "date, origin, destination, departure and arrival time, number of passengers, the identity of the passengers and flight hours for each flight leg flown" as well as the purpose of each trip taken aboard the Flight Program. (*Id.* at ¶ 53.)

The dispute in this case arises from certain Company officials' private usage of the Flight Program. According to the Complaint, three Company Officers—Brian P. Friedman, Richard B. Handler, and Joseph S. Steinberg[5]—have made extensive personal use of the Flight Program since 2012. (*Id.* ¶¶ 52–57.) They have allegedly used the Flight Program to travel across the United States and overseas for personal purposes, often with large entourages of friends and family. (*Id.*) And they have also allegedly permitted their personal acquaintances to travel unaccompanied on private trips using the Flight Program. (*Id.* at ¶¶ 62–68.) The Complaint states that between 2015 to 2018, the Officers' personal use of the Flight Program accounted for nearly 70% of the Flight Program's total use. (*Id.* at ¶ 61.)

## II.     The Special Committee Investigation

On March 6, 2018, Rubenstein made a written demand on the Board to "investigate the [Officers'] personal use of the Aircraft, and the Company's public disclosures of such use," and to commence legal action against the Officers. (*Id.* at ¶ 112; Hung Decl. Ex. A ("Demand Letter"), ECF 10.) Shortly thereafter, the Board on April 4, 2018 formed the Special Committee to investigate Rubenstein's demands. (*Id.* at ¶ 113.) The Special Committee consisted of two independent directors, Robert E. Joyal and Michael T. O'Kane, and was assisted by outside counsel, Boies Schiller Flexner LLP ("Boies Schiller"). (Wang Decl. Ex. 1 ("Special Committee

---

[5] Brian P. Friedman has served as the President and as a director of Jefferies since 2013; Richard B. Handler has served as the Chief Executive Officer and as a director of Jefferies since 2013; and Joseph S. Steinberg has served as the Chairman of the Board since 2013. (Compl. ¶¶ 19, 21, 31.)

Report"), at 1, ECF 8.)

The Special Committee's investigation lasted approximately six months, from May 2018 to October 2018. (Compl. ¶ 113.) Over the course of its investigation, the Special Committee: (1) "requested and obtained from the Company thousands of pages of documents relating to the Flight Program"; (2) interviewed eight Jefferies employees involved in the Flight Program, including those responsible for overseeing its operation and handling its "tax, proxy and compliance issues"; (3) interviewed the Officers and two of their personal assistants; and (4) personally inspected the Flight Program hangar in Morristown, New Jersey, "where the corporate aircraft are kept and original records related to the Flight Program are maintained." (*See* Special Committee Report, at 2–3.) Although Boies Schiller executed the bulk of these investigatory tasks on behalf of the Special Committee, the Special Committee directors "oversaw the investigation . . . in all aspects" and conferred with Boies Schiller multiple times each month to provide feedback and instruction.[6] (*Id.* at 2.)

On October 25, 2018, the Special Committee presented its findings ("Special Committee Report") to the Board.[7] (Compl. ¶ 114; Wang Decl. Ex. 2 ("October 2018 Minutes"), ECF 8.) The Special Committee Report concluded that there was "no evidence of fraud or abuse by any of the executives in connection with their use of corporate aircraft" and that instead, "each of the executives took care to comply with the Company's policies and procedures" in good faith. (*See* Special Committee Report, at 3–4; October 2018 Minutes, at 2.) It also concluded that the legal claims set forth in Rubenstein's demand had no "factual or legal basis" and that pursuing

---

[6] During its investigation, the Special Committee also obtained a tolling agreement from Mr. Steinberg to preserve potential claims. (Wang Decl. Ex. 1 ("Special Committee Report"), at 2, ECF 8.)

[7] The Officers did not attend the October 2018 meeting in which the Special Committee's recommendations were adopted. (Wang Decl. Ex. 2 ("October 2018 Minutes"), at 1, ECF 8.)

litigation would present "substantial distraction" to the Company while reaping no benefits and incurring unjustified expenses, namely "attorneys' fees and the expenditure of Company resources." (*See* Special Committee Report, at 3–4.)

Based on this analysis, the Special Committee recommended that the Board reject Rubenstein's litigation demand. (*Id.* at 4; October 2018 Minutes, at 3.)  The Special Committee, however, also recommended the following remedial measures:[8]  (1) that Officer Steinberg reimburse the Company $235,928.90 for several trips that had been mistakenly classified as personal; (2) that additional controls be integrated into the Jet Policy; (3) that employees associated with the Flight Program receive "refresher training on applicable rules and guidelines"; and (4) that the Company disclose in its annual proxy statements the disallowed tax deductions attributable to the Officers' personal use of the Flight Program.[9]  (*See* Special Committee Report, 4–5.)  The Board, after discussing and reviewing the Special Committee Report and presentation, adopted these remedial measures and rejected Rubenstein's litigation demand.  (*See* October 2018 Minutes, at 3.)

## III.    **Rubenstein's Derivative Lawsuit**

In May 2019, Jefferies produced the Special Committee Report to Rubenstein and the minutes of the October 2018 Board meeting in which the Special Committee's recommendations

---

[8] The Special Committee qualified these recommendations by stating:

> The recommendations contained in this report do not imply that the practices or processes in place fell below the standard required of the Company's management and directors.  Further, some of the recommendations reflect practices already followed by the Board or management prior to the issuance of this report.

(*See* Special Committee Report, at 5.)

[9] The Board adopted the Special Committee's recommendation to "disclose [in Company proxy statements] the amount of the disallowed tax deductions attributable to personal use" during a follow-up Board meeting on January 22, 2019.  (Compl. ¶ 115.)

were adopted. (Compl. ¶ 119.) Dissatisfied with the Board's actions, Rubenstein commenced

this derivative lawsuit in April 2020. (ECF 5.)

The gravamen of Rubenstein's lawsuit is that the Officers grossly abused the Flight

Program for their personal use, and that the Board failed to adequately monitor and investigate

such wrongdoing, in breach of their fiduciary duties. (See Compl. ¶¶ 131–198.) According to

Rubenstein, this pattern of corporate misfeasance has cost Jefferies shareholders millions of

dollars in disallowed tax deductions and fixed costs associated with the Flight Program. (Id. at

¶¶ 56, 62.)

In addition to his breach of fiduciary duty claims, Rubenstein also pleads a Section 14(a)

claim under the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a), and

Rule 14a-9, 17 C.F.R. § 2401.14a–9, promulgated thereunder. His Section 14(a) claim alleges

that, from 2012 to 2020, the Board made materially false and misleading proxy statement

disclosures in connection with the Flight Program. (Compl. ¶¶ 146–154.) Specifically,

Rubenstein contends that the following disclosures were materially false and misleading: (1) the

Company's failure to attribute a portion of the Flight Program's fixed costs to the Officers'

executive perquisites disclosures and (2) the Company's representations that the Flight Program

is maintained for a business purpose.[10] (Id. at ¶¶ 79–88.) Rubenstein contends that these false

and misleading representations allowed Board members to win reelection each year and that

those Board members, in turn, turned a blind eye to the Officers' exploitation of the Flight

Program. (Id. at 151.)

---

[10] Specifically, the complaint alleges that the Company's proxy statements falsely represented (1) that the Flight Program was "business aircraft" and (2) that the fixed costs of maintaining the Flight Program would have been incurred "regardless" of personal use. (Compl. ¶¶ 87–88.)

## IV.    Motion to Dismiss

The Defendants now move to dismiss this derivative lawsuit under Rules 12(b)(6) and

23.1 of the Federal Rules of Civil Procedure.  (ECF 6.)  The Defendants argue (1) that

Rubenstein lacks standing to bring this case because some of the misconduct he alleges

transpired before he had obtained shares in the Company (Defs.' Brief, at 13, ECF 7), and (2)

that the Board exercised its good faith business judgment in rejecting Rubenstein's litigation

demand and accordingly, the business judgment rule warrants dismissal of the instant action.

(*Id.* at 14–18.)

## APPLICABLE LAW

### I.    Pleading Requirements

#### A. Rule 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)) (cleaned up).  A claim is facially plausible "when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.*  "Threadbare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice." *Id.*

When considering a Rule 12(b)(6) motion, the district court accepts as true all of the

factual allegations contained in the complaint and draws all reasonable inferences in the

plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  That

tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  Thus a pleading

that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of

8

action will not do." *Twombly*, 550 U.S. at 555.

### B. Derivative Lawsuits Under Rule 23.1

It is well established that a "shareholder seeking to assert a claim on behalf of the corporation must first exhaust intracorporate remedies by making a demand on the directors to obtain the action desired." *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004) (cleaned up). If the company's board of directors rejects the shareholder's demand to bring a derivative lawsuit, the suit may "proceed only if the shareholder shows that the board's refusal was wrongful." *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229, 234 (2d Cir. 2015) (cleaned up). Accordingly, under Rule 23.1 of the Federal Rules of Civil Procedure, a plaintiff bringing a derivative suit must plead with "particularity" that her litigation demand was wrongfully refused by the company's board. FED. R. CIV. P. 23.1(b)(3) ("The complaint must be verified and must state with particularity . . . the reasons for not obtaining the action or not making the effort."); *see also Espinoza*, 797 F.3d at 234. While Rule 23.1 provides the pleading standard for demand refusal, the substantive question of whether demand was wrongfully refused is assessed under state law. *Espinoza*, 797 F.3d at 234; *see RCM Sec. Fund, Inc. v. Stanton*, 928 F.2d 1318, 1326 (2d Cir. 1991).

### II.   New York's Business Judgment Rule

New York law[11] provides that derivative suits against corporate directors "belong to the corporation itself" and as such, "the decision whether and to what extent to explore and prosecute such claims" is a business judgment left up to the broad discretion of the company's board of directors. *Auerbach v. Bennett*, 393 N.E.2d 994, 1001 (1979); *see Lerner ex rel. Gen.*

---

[11] The parties agree that New York law applies in this case because Jefferies is incorporated in New York. *See Stein v. Immelt*, 472 F. App'x 64, 65 (2d Cir. 2012) ("New York is the state of GE's incorporation, and so New York law governs this case.").

*Elec. Co. v. Immelt*, 523 F. App'x 824, 826 (2d Cir. 2013) ("In evaluating a board's decision to reject a shareholder demand, New York law presumes that the decision was the exercise of valid business judgment."). The business judgment rule[12] thus forecloses judicial inquiry into the board's substantive decision to adopt or refuse a derivative lawsuit demand. *Auerbach*, 393 N.E.2d at 1002 ("[The] substantive decision falls squarely within the embrace of the business judgment doctrine, involving as it did the weighing and balancing of legal, ethical, commercial, promotional, public relations, fiscal and other factors familiar to the resolution of many if not most corporate problems."). But the board's "investigative" procedure that informed its decision is subject to judicial scrutiny. *See id.* ("As to the methodologies and procedures best suited to the conduct of an investigation of facts and the determination of legal liability, the courts are well equipped by long and continuing experience and practice to make determinations.").

Where a disinterested litigation committee is formed by the board of directors to investigate the merits of a derivative lawsuit demand, the New York Court of Appeals has instructed courts to limit their inquiry into whether "the directors who made the decision were personally conflicted with respect to the demand, or [whether] they did not employ adequate and appropriate investigative procedures and methodologies in considering the demand." *Lerner*, 523 F. App'x at 826 (citing *Auerbach*, 393 N.E.2d at 1001–03) (cleaned up). Thus, if the special committee's investigation was made in good faith and adequately conducted, then a board's demand refusal based on the investigation's findings is a valid exercise of business judgment,

---

[12] The rationale behind the business judgment rule is to prevent "court intervention in corporate governance decisions" and to prevent corporations from having to answer to courts for their decisions. *See* Sean J. Griffith, *Good Faith Business Judgment: A Theory of Rhetoric in Corporate Law Jurisprudence*, 55 Duke L.J. 1, 9–16 (2005). It is debatable, however, whether a corporation's decision to bring—or not bring—a derivative action is indeed a purely business decision, given the public values derivative lawsuits seek to vindicate and the lack of adequate alternatives 21st century shareholders possess in orchestrating governance reform. *See* Matthew D. Cain et. al., *How Corporate Governance Is Made: The Case of the Golden Leash*, 164 U. Pa. L. Rev. 649, 660–663 (2016).

and the court must dismiss the suit under the business judgment rule. *Auerbach*, 393 N.E.2d at

1001–03. The adequacy of an investigation will vary depending on the particular controversy in

question. *Auerbach*, 393 N.E.2d at 1001–03; *see Sciabacucchi v. Burns*, No. 15-CV-7506

(PKC), 2016 WL 4074446, at *7 (S.D.N.Y. July 29, 2016). But, as a general matter, an

investigation that is conducted in good faith and into relevant "areas and subjects" will be

deemed adequate. *Auerbach*, 393 N.E.2d at 1003. An investigation, however, that "has been so

restricted in scope, so shallow in execution, or otherwise so Pro forma or halfhearted as to

constitute a pretext or sham" must be rejected. *Id.*

## ANALYSIS

### I.   Article III Standing

The Defendants first argue that Rubenstein lacks standing to bring this case because some

of the misconduct he alleges in his Complaint occurred before he became a Jefferies shareholder

in March 2017. (Defs.' Brief, at 13–14.) To demonstrate Article III standing, Rubenstein must

establish (1) an injury-in-fact that is concrete and particularized; (2) "causal connection between

the injury and the conduct complained of"; and (3) likelihood of redressability by a favorable

ruling. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also Monsanto Co. v.

Geertson Seed Farms*, 561 U.S. 139, 149–150 (2010). Additionally, in the context of derivative

lawsuits, Article III standing is assessed under Rule 23.1(b) of the Federal Rules of Civil

Procedure, which sets forth the "contemporaneous ownership rule." *In re Facebook, Inc., Initial

Pub. Offering Derivative Litig.*, 797 F.3d 148, 157 (2d Cir. 2015); *see* FED. R. CIV. P. 23.1(b)(1).

The contemporaneous ownership rule,[13] as its name suggests, requires "the plaintiff in a

---

[13] The contemporaneous ownership rule, which dates back to 1882, originally served to prevent forum shopping by plaintiffs who sought to collusively establish diversity jurisdiction in the federal courts. 7C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1828 (3d ed.). Over time, however, the rule has evolved to

derivative action to demonstrate possession of an ownership interest in the company it seeks to represent that is contemporaneous with the conduct for which it seeks recovery." *In re Facebook*, 797 F.3d at 157; *see* FED. R. CIV. P. 23(b)(1) ("The complaint must be verified and must allege that the plaintiff was a shareholder . . . at the time of the transaction complained of[.]").

One of the most troubling problems that arises under Rule 23.1(b) is what conduct constitutes a single transaction. *See* 7C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1828 (3d ed.). This quandary matters because if a singular transaction is alleged, the plaintiff must have "acquired stock in the company before *all* of the core conduct occurred in order to bring suit." *In re Bank of New York Derivative Litig.*, 320 F.3d 291, 298 n. 4 (2d Cir. 2003). But if "a series of separate transactions" is involved, the plaintiff may establish standing over the transactions that occurred after her acquisition of company stock. *Id.* "Whether the conduct at issue in a given complaint amounts to a continuous transaction or a series of discrete transactions is a fact-specific question to be decided on a case-by-case basis" by the district court. *Id.*

As a preliminary matter, Rubenstein acknowledges that he lacks standing to sue (under the contemporaneous ownership rule) for alleged wrongdoing that occurred prior to March 2017. (Pls.' Opp. Brief, at 17–19, ECF 9.) He argues, however, that his Complaint alleges a "series of separate transactions" and thus that he should be able to assert standing for the wrongful transactions that postdate March 2017. (*Id.*) The Defendants respond that this lawsuit is really based on a single transaction of wrongdoing, and since Rubenstein was only a shareholder for a

---

primarily serve the "general principle of equity aimed at preventing the federal courts from being used to litigate purchased grievances." *Id.*; *see also In re Bank of New York Derivative Litig.*, 320 F.3d 291, 297 (2d Cir. 2003).

part of it, he lacks standing *in toto* to bring this action.  (Defs.' Brief, at 13–14.)

The Court concludes that the contemporaneous ownership rule deprives Rubenstein of standing to complain about Company conduct occurring prior to March 2017, but that he may assert standing for alleged wrongdoing that occurred after that date.  It is far-fetched to suggest, as Defendants do, that the complaint is premised on a single transaction of Company misfeasance.  By its plain terms, the Complaint alleges numerous instances of corporate wrongdoing (*see, e.g.*, Compl. ¶¶ 67, 75, 86–88), to wit the Officers' personal use of the Flight Program after March 2017 (*see id.* at ¶¶ 67, 75), and the misleading proxy disclosures made by the Board from 2012 to 2020, which allegedly prevented shareholders like Rubenstein from casting fully informed and intelligent votes at shareholder meetings.  (*Id.* at ¶ 87.)  Thus, because Rubenstein was a contemporaneous shareholder for at least some of these wrongful transactions, the Court holds that he has established Article III standing to bring this case.  *See In re Bank of New York Derivative Litig.*, 320 F.3d at 297 ("[W]hen a series of wrongful transactions is alleged and some of them transpired before plaintiff became a shareholder but others took place subsequent to that date, the shareholder's action may be maintained only on the basis of the later events.").

The leading cases on the contemporaneous ownership rule reinforce the Court's conclusion.  For example, in *In re Facebook, Inc., Initial Public Offering Derivative Litigation*, the Second Circuit addressed the issue of whether Facebook's allegedly misleading disclosures in connection with its initial public offering constituted a *single transaction* of corporate wrongdoing.  797 F.3d at 159.  The Second Circuit concluded yes, but only because the disclosures at the center of the lawsuit were promulgated around the same time and in connection with one main event:  the Facebook IPO.  *Id.*  Similarly, in *In re Bank of New York Derivative*

13

*Litigation*, the Second Circuit also analyzed an allegedly illegal business expansion into Eastern Europe as a single transaction. 320 F.3d at 299–300. The court reached that conclusion because the business expansion involved a series of unlawful business dealings that took place during a concentrated four-year period and because each of the unlawful dealings were tethered to a single event: the bank's business expansion into Eastern European. *Id.*

In contrast here, the Complaint alleges wrongful acts by the Defendants that are fragmented by both time (2012 to the present) and by their very nature (varying allegations of corporate wrongdoing). And unlike those two cases, there is no major event such as an IPO or European business expansion that lies at the heart of Rubenstein's lawsuit. Accordingly, the Court concludes that the complaint is best analyzed as alleging discrete instances of corporate misfeasance and therefore that Rubenstein has standing to complain of wrongdoing that occurred after March 2017. *See In re Bank of New York Derivative Litig.*, 320 F.3d at 297.

## II.   <u>Breach of Fiduciary Duty Claims</u>

In order to defeat the Defendants' motion to dismiss, Rubenstein must plead with particularity that his litigation demand was wrongfully refused by the Board. As noted above, a demand is wrongfully refused under New York law where "the directors who made the decision were personally conflicted with respect to the demand, or [if] they did not employ adequate and appropriate investigative procedures and methodologies in considering the demand." *Lerner*, 523 F. App'x at 826 (citing *Auerbach*, 393 N.E.2d at 1001–03). Rubenstein does not allege that the Board or the Special Committee suffered from a conflict of interest in considering his demand.[14] Rather, he contends that the Special Committee conducted an inadequate

---

[14] All of the complaint's substantive allegations are about the inadequacy of the Special Committee's investigation, not its disinterestedness. (Compl. ¶¶ 123–130.) Accordingly, the complaint's fleeting accusations that the Board

investigation of his demand and hence, that the Board's demand refusal does not merit business judgment rule protection.  (Compl. ¶¶ 123–130.)

  The Complaint pleads four reasons why the Special Committee's investigation was inadequate.[15]  *First*, because the Special Committee Report did not specifically mention or make a recommendation regarding the Flight Program's extensive private use, the Complaint alleges that the "Special Committee failed to adequately inform itself as to who was actually using the Aircraft, and whether the use complied with the Company's internal policies."  (Compl. ¶ 124.) *Second*, the Complaint alleges that because the Special Committee Report did not expressly mention the fact that the Officers' private use accounted for "close to 70% of total use," the Special Committee did not "adequately inform itself as to the true extent of personal use" by the Officers.  (*Id.* at ¶¶ 126–127.)  *Third*, the Complaint asserts that the Special Committee "failed to adequately inform itself as to the true costs of" the Officers' personal use.  (*Id.* at ¶ 128.) *Finally*, given that the Special Committee did not recommend additional reimbursements from the Officers (besides those requested of Steinberg), the Complaint alleges that the Special Committee failed to adequately investigate the issue of whether certain flights were improperly classified.[16]  (*Id.* at ¶ 130.)  For the following reasons, these allegations cannot overcome Defendants' motion to dismiss.

---

and Special Committee "breached their duty of loyalty" are insufficient, under Rule 23.1, to show that they suffered from a conflict of interest. FED. R. CIV. P. 23.1(b)(3).

[15] Rubenstein contends that he does not need to plead wrongful refusal because New York law does not require it. (Pls.' Opp. Brief, at 7–8.)  That is incorrect; under Rule 23.1 of the Federal Rules of Civil Procedure, Rubenstein must plead wrongful refusal. *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229, 234 (2d Cir. 2015).

[16] In further support of this allegation, Rubenstein references social media posts on Officer Handler's personal Instagram page and argues that they are evidence certain flights were improperly misclassified. (Compl. ¶ 130.)

*Inadequate Pleadings.* The Court finds that the Complaint does not plead wrongful refusal with sufficient particularity as required by Rule 23.1. FED. R. CIV. P. 23.1(b)(3). As a general matter, nearly all of the Complaint's allegations rely on the fact that the Special Committee Report did not make certain recommendations, such as suspending personal use of the Flight Program or requesting additional reimbursements from the Officers. (Compl. ¶¶ 125 130.) But these are really substantive disagreements with the Board's final decision, not allegations of a defective process, which the business judgment rule insulates from judicial second-guessing. *See Auerbach*, 393 N.E.2d at 1002 ("While the court may properly inquire as to the adequacy and appropriateness of the committee's investigative procedures and methodologies, it may not under the guise of consideration of such factors trespass in the domain of business judgment."). Rule 23.1 does not permit Rubenstein to reverse engineer a defective investigatory process by taking issue with the bottom-line conclusions contained in the Special Committee Report. *See id.*

In addition, the Complaint also alleges that the investigation was inadequate because the Special Committee Report did not expressly reference the Officers' personal trips or the fact that their private use constituted 70% of total use between 2015 to 2018. (Compl. ¶¶ 126–127.) The theory undergirding this argument is simple: because the Special Committee did not articulate certain facts in the Special Committee Report, it must not have investigated those facts. (*Id.*) But the Court finds that line of reasoning unpersuasive. The mere absence of certain terminology or specific parcels of information in the Special Committee Report does not plausibly reveal that the underlying investigation was flawed. Thus, after carefully reviewing the complaint, the Court concludes that it fails to sufficiently plead wrongful refusal under Rule 23.1's heightened pleading standard.

*Adequate Investigation.*  Pleadings aside, this case must be dismissed with prejudice because the Special Committee (in fact) conducted a thorough and diligent investigation in accordance with New York law.  As noted before, the Special Committee's investigation lasted nearly six-months and was facilitated by capable outside counsel, Boies Schiller, who:  obtained and reviewed thousands of pages worth of documents relating to the Flight Program; interviewed thirteen Jefferies employees associated with the Flight Program, including the Officers; and went as far as personally visiting the Flight Program hangar to inspect original copies of documents. (*See* Special Committee Report, at 2–3.)  Furthermore, every step of its work was overseen by the Special Committee directors, who conferred with Boies Schiller multiple times each month "to discuss investigative steps and to provide feedback and instruction."  (*Id.*)  Thus, in considering these facts in tandem, the Court finds that the Special Committee's investigation turned square corners and did everything New York law required.  *See, e.g., Sciabacucchi*, 2016 WL 4074446, at *6–7 (nine-month special committee investigation assisted by capable outside counsel found adequate under New York law); *Strougo v. Bassini*, 112 F. Supp. 2d 355, 365 (S.D.N.Y. 2000) (five-month long investigation that interviewed "an appropriate range of perspectives" found adequate); *Kenney v. Immelt*, 981 N.Y.S.2d 636 (N.Y. Sup. 2013) (investigation assisted by outside counsel that reviewed "thousands of documents" and conducted multiple interviews was adequate); *cf. In re Par Pharm., Inc. Derivative Litig.*, 750 F. Supp. 641, 644 (S.D.N.Y. 1990) (special committee investigation found inadequate where no outside counsel was retained and no final report was promulgated).

In rejoinder, Rubenstein rehashes the same allegations of inadequate investigation as those pled in the complaint, which the Court must again reject for the reasons stated above.  *See supra* 15–16.  Rubenstein, however, makes an additional argument that the Special Committee's

17

investigation was flawed because it "failed to document in the Report its findings and the reasoning and analysis by which it arrived at its conclusions." (Pls.' Opp. Brief, at 13.) The Court disagrees.

As a preliminary matter, the Court is not obliged to consider this argument because it was not pled in the complaint as required by the pleading rules. *See* FED. R. CIV. P. 23.1(b)(3). But even if the Court were to entertain the contention, it founders, because the Special Committee Report and the October 2018 meeting minutes did indeed set forth the reasoning by which the Special Committee arrived at its final recommendations. The Special Committee Report reasoned that upon concluding the six-month long investigation, the Special Committee did not find any legal or factual basis to pursue Rubenstein's litigation demand, especially where the lone Officer defendant who was found to have mistakenly classified certain flights voluntarily agreed to reimburse appropriate costs to the Company. (*See* Special Committee Report, at 5.) Moreover, apart from these legal considerations, the Special Committee Report also explained that compelling business factors weighed against pursuing litigation:

> Putting the lack of any factual or legal basis for a claim, the Special Committee concluded that there are numerous reasons for not bringing the litigation set forth in the Demand Letter. Among other things, the litigation proposed by the Demand Letter would be a substantial distraction to the Company and its key executives, thereby harming the day-to-day operations of the Company. In addition, the substantial cost of pursuing the claims in the Demand Letter—including attorneys' fees and the expenditure of Company resources—would reap no benefit.

(*Id.* at 4.)

Rubenstein perhaps may have disagreed with this reasoning or the Board's demand refusal that followed. But he cannot credibly argue that the Special Committee failed to document "its

findings and the reasoning and analysis by which it arrived at its conclusions" where the record demonstrates the contrary.[17]

Rubenstein also relies on *City of Orlando Police Pension Fund v. Page*, 970 F. Supp. 2d 1022 (N.D. Cal. 2013), but his reliance is misplaced. In *Page*, the plaintiff brought a shareholder derivative action against Google and its board of directors for allegedly unlawful advertising practices. *Id.* at 1024. Notably, for that same cause of action, Google had previously entered into a non-prosecution agreement with the U.S. Department of Justice and had agreed to pay a $500 million fine and acknowledge "acceptance of responsibility." *Id.* at 1025. Given this background, the *Page* court found that Google's special committee investigation into the plaintiff's demand was inadequately conducted because the special committee (1) did not publicly release its report (2) failed to interview anyone with relevant knowledge about the DOJ prosecution and (3) made the "sweeping conclusion that no wrongdoing" occurred despite Google's admission of responsibility in the non-prosecution agreement. *Id.* at 1030–32. Here, however, each of these considerations swings the other way. The Special Committee made its report public, interviewed all the key figures associated with the Flight Program, and ultimately recommended several remedial measures, all of which the Board adopted. Plus, Jefferies did not stare down the barrel of a $500 million, admission of guilt, non-prosecution agreement with the

---

[17] Rubenstein's reliance on *In re Par Pharmaceutical, Inc. Derivative Litigation* is inapposite. 750 F. Supp. 641 (S.D.N.Y. 1990). In *Par Pharmaceutical*, the court found that the special litigation committee conducted an inadequate investigation because it did not "retain independent counsel" and because it "failed to document in any manner its procedures, reasoning or conclusions." *Id.* at 647. The special committee there had not even completed its investigation nor promulgated any "report describing its methodology, reasoning, and conclusions" at the motion to dismiss stage. *Id.* at 644 n.5. All this led the court to conclude that the special committee's final recommendations were effectively insulated from judicial scrutiny and therefore, that the investigation was inadequate. *Id.* at 647. Each of the circumstances that established inadequacy in *Par Pharmaceutical* counsels the opposite result in this case, where the Special Committee retained outside counsel and promulgated a formal report containing its reasoning and conclusions.

Government, like Google did in *Page*.  Accordingly, *Page* does not lend support for
Rubenstein's position.

Finally, Rubenstein's reliance on *Barovic v. Ballmer*, 72 F. Supp. 3d 1210 (W.D. Wash.
2014), also does not fare much better.  In *Barovic*, Microsoft allegedly violated the terms of an
antitrust settlement agreement with the European Union and as a result, incurred a $732.2 million
fine.  *Id.* at 1212–14.  Plaintiffs (dissatisfied shareholders) subsequently issued a litigation
demand on Microsoft's board of directors, which the board refused after an investigation by a
specially formed "Demand Review Committee."  *Id.*  Following the demand refusal, the
plaintiffs filed a derivative lawsuit in federal court and argued that the committee's investigation
was inadequate.  *Id.*  The court agreed, but only because it found that the committee failed to
interview any "European Commission official regarding the company's violation" of the
settlement agreement.  *Id.* at 1215–16.

This case stands in stark contrast to *Barovic*.  Here, Rubenstein does not allege any
additional individuals—let alone, key figures—whom the Special Committee failed to interview
during its investigation.  Instead, he contends that because the committee in *Barovic* reviewed
more documents and interviewed more witnesses—yet still came up short—that the Special
Committee's investigation must likewise be wanting.  (Pls.' Opp. Brief, at 15.)  Such a thesis
fails; the adequate investigation inquiry does not call for a numbers game but a functional, case
specific approach which assesses the qualitative (not quantitative) value of the investigation.  *See*
*Auerbach*, 393 N.E.2d at 1003  ("What evidentiary proof may be required to this end will, of
course, depend on the nature of the particular investigation[.]"); *see also Barovic*, 72 F. Supp. 3d
at 1215 ("There is no universal prescribed procedure that a board must follow in assessing

shareholder demands.") (cleaned up).  Accordingly, the Court finds Rubenstein's reliance on *Barovic* inapposite.

In sum, because Rubenstein cannot demonstrate wrongful refusal under Rule 23.1 and New York law, the Board's decision to refuse his litigation demand is entitled to business judgment rule protection.  Rubenstein's derivative lawsuit must therefore be dismissed.

### III.    <u>Section 14(a) Claim</u>[18]

As a fallback position, Rubenstein argues that even if the business judgment rule warrants dismissal of his breach of fiduciary duty claims, his federal Section 14(a) claim under the Exchange Act cannot be dismissed pursuant to the Second Circuit's decision in *Galef v. Alexander*, 615 F.2d 51 (2d Cir. 1980).  (Pls.' Opp. Brief, at 15 n. 17.)  In *Galef*, the Second Circuit held that well-pleaded Section 14(a) claims may not be summarily dismissed under the business judgment rule because to do so would frustrate the federal policy undergirding Section 14(a).  615 F.2d at 63–64.

*Galef*, however, is limited in application to *well-pleaded* Section 14(a) claims.  *Id.* at 64.  Indeed, the Second Circuit has also long recognized that "efforts to dress up [fiduciary duty] claims . . . in a 14(a) suit of clothes have consistently been rejected."  *Maldonado v. Flynn*, 597 F.2d 789, 796 (2d Cir. 1979) (cleaned up); *see Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999) ("We have long recognized that no general cause of action lies under § 14(a) to remedy a

---

[18] Defendants argue that Rubenstein's Section 14(a) claim must independently be dismissed because it was brought outside the one-year statute of limitations. *Bensinger v. Denbury Res. Inc.*, 31 F. Supp. 3d 503, 507 (E.D.N.Y. 2014) (stating that the statute of limitations for Section 14(a) claims is "one year after the discovery of the facts constituting the cause of action and no later than three years after the cause of action accrued").  Defendants' argument sweeps too broadly.  Rubenstein complains of proxy statements promulgated between 2012 to 2020, (Compl. ¶ 87) and therefore, at least some of the allegedly defective disclosures occurred within the statute of limitations period. *Bensinger*, 31 F. Supp. 3d at 507.  But in any event, because Rubenstein's Section 14(a) claim is not well-pleaded, the claim is dismissed.

simple breach of fiduciary duty."). The question here, then, is whether Rubenstein's Section 14(a) claim is well-pleaded.

To state a Section 14(a) claim under the Exchange Act, Rubenstein must demonstrate: (1) that "the proxy statement contained a material misstatement or omission, which (2) caused plaintiff's injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Bond Opportunity Fund v. Unilab Corp.*, 87 F. App'x. 772, 773 (2d Cir. 2004). Rubenstein does not make out a well-pleaded Section 14(a) claim under this standard. He contends that Jefferies' proxy statements misled shareholders (1) by failing to attribute a portion of the Flight Program's fixed costs to the Officers' executive perquisites disclosures and (2) by failing to be more forthcoming about the fact that the Flight Program was used primarily for personal purposes. (Compl. at ¶¶ 79–88.) Assuming these disclosures were material, Rubenstein's claim must still fail because it does not plausibly allege loss causation between the misleading proxy disclosures and the claimed injuries. *Bond*, 87 F. App'x. at 773. As the court in *Witchko v. Schorsch* stated, "the mere fact that omissions in proxy materials, by permitting directors to win re-election, indirectly lead to financial loss through mismanagement will not create a sufficient nexus with the alleged monetary loss." No. 15 CIV. 6043 (AKH), 2016 WL 3887289, at *7 (S.D.N.Y. June 9, 2016) (quoting *General Electric Co. v. Cathcart*, 980 F.2d 927, 933 (3d Cir. 1992). The Court therefore holds that Rubenstein's Section 14(a) claim is not well-pleaded and that it must be rejected.

## CONCLUSION

The Court does not need to reach the merits of the parties' fiduciary duty claims because Rule 23.1 and the business judgment rule require dismissal of Rubenstein's derivative lawsuit. Because amendment would be futile, the Court **GRANTS** the motion to dismiss with prejudice.

The Clerk of the Court is directed to terminate this case.

Dated: New York, New York
      April 6, 2021

SO ORDERED

*Paul A. Crotty*
PAUL A. CROTTY
United States District Judge